**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0738n.06
Filed: October 17, 2007

**No. 05-1039**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| THELMON F. STUCKEY, III, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |

**Before: RYAN, DAUGHTREY, and ROGERS, Circuit Judges.**

**ROGERS, Circuit Judge.** Thelmon F. Stuckey III was charged with and convicted of "murder to prevent a person from providing information concerning a federal crime to federal authorities" for shooting Ricardo Darbins. The Government introduced eyewitness testimony, as well as rap lyrics written by Stuckey that exhibited Stuckey's negative feelings toward "snitches" and described shooting witnesses, wrapping their bodies in plastic, and dumping their bodies in the road, which is what happened to Darbins. Stuckey was also convicted of conspiracy to distribute cocaine, conspiracy to launder monetary instruments, being a felon in possession of a firearm, tampering with a witness, and laundering of financial instruments.

Stuckey challenges his convictions on several grounds. First, Stuckey argues that several comments and actions by the Assistant United States Attorney (AUSA) who prosecuted the case were improper. Second, Stuckey argues that the district court erred by denying his motion to

suppress evidence discovered by federal agents during a search of an apartment in Georgia where Stuckey was arrested. Third, Stuckey argues that the district court should have suppressed the rap lyrics, which were also found during the above-mentioned search. Fourth, Stuckey argues that his counsel was constitutionally ineffective. Finally, Stuckey argues that overall, his trial was unfair.

We affirm Stuckey's conviction. First, any error that the district court may have made in denying Stuckey's motion to suppress evidence searched and seized in the apartment where Stuckey was arrested was harmless beyond a reasonable doubt. Second, the district court did not err by admitting Stuckey's rap lyrics as evidence. Third, although seven of the AUSA's comments or actions were improper (or arguably improper), the comments and actions were not flagrant and do not otherwise require a reversal of Stuckey's convictions. Fourth, Stuckey's ineffective assistance of counsel claims are better suited for habeas review. Finally, overall, Stuckey's trial did not violate due process.

**I.**

On January 23, 2003, a grand jury indicted Thelmon F. Stuckey III in a third superseding indictment for (1) conspiracy to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 841 & 846 ("Count One"); (2) murder to prevent a person from providing information concerning a federal crime to federal authorities, in violation of 18 U.S.C. § 1512(a)(I)(C) ("Count Two"); (3) conspiracy to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii), & 1956(h) ("Count Four"); (4) felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) ("Count Five"); (5) witness tampering, in violation of 18 U.S.C. § 1512(b)(1) & (i)

("Count Six"); and (6) laundering of financial instruments, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) ("Count Seven").[1] The indictment also included a forfeiture allegation pursuant to 21 U.S.C. § 853.

Murder

The incident at the center of Stuckey's trial was the murder of Ricardo "Slick" Darbins, a former Detroit Police Officer. The Government argued that Stuckey murdered Darbins in an attempt to keep Darbins from cooperating with federal authorities. The events leading up to the murder are as follows: Darbins had been indicted by a federal grand jury for cocaine trafficking offenses in June of 1996 after an FBI wiretapping investigation. On August 3, Darbins shot at but missed an informant in a record store. Steven Felder, a drug dealer and cooperating witness for the Government, testified that he overheard an upset Stuckey later tell another man that Darbins was "a fake ass n***er" for not having shot the informant. Felder testified that Stuckey said he was waiting in Darbins' pickup truck at the time of Darbins' attempted shooting of the informant. On August 5, 1996, a complaint and warrant charged Darbins with attempting to kill a confidential informant who assisted the FBI with the investigation.

Felder also testified that on August 6, 1996, he witnessed Stuckey murder Darbins. Stuckey and Darbins arrived at 385 Monterey, a house in Detroit where Felder and Verdell Murrie lived. As

---

[1]The indictment also charged Dinnis Sifford (aka "Din Din") and Verdell Murrie, both cousins of Stuckey, with conspiracy to distribute cocaine and cocaine base and accessory after the fact to murder, and both pleaded guilty. The indictment charged another individual who died before the trial began.

Felder and Darbins sat in the bedroom watching television, and Darbins also talked on a cordless phone, Felder heard the front door slam and then saw Stuckey shoot Darbins seven times, then stand over Darbins and fire four more shots.[2] Felder saw Stuckey bend over Darbins' body; kiss him on his cheek or nose; tell him "that he loved him [and] he was going to take care of his family, but he talked too much"; and take Darbins' watch and wallet. Felder stated that the gun was a .40 caliber semiautomatic.

Felder went next door, told Murrie what had happened, and the two of them then returned to the house. Stuckey picked up shell casings from the gun that were on the floor and Felder and Murrie wrapped Darbins' body in blankets and sheets. Stuckey said that he was going to call a "clean up man," and Dinnis Sifford later arrived with rope, gloves, and a roll of plastic. The four of them then wrapped Darbins' body in plastic, tied it with rope, and placed the body in the trunk of the car that Sifford arrived in, a Caprice Classic that belonged to Stuckey. Stuckey, Felder, Sifford, and Murrie then drove in two separate cars to an alley where they dumped Darbins' body. Darbins' body was discovered on the morning of August 7.[3]

_____

[2]Felder testified that he did not recall whether any of the gun shot wounds were to Darbins' face or head.

[3]An autopsy revealed that Darbins (who at the time of the autopsy was known to police only as "unknown male number 107") was shot between seven and fifteen times, including four times in the head. Each of the wounds was "through-and-through" (i.e., the bullet entered and exited the body), which indicated that a large caliber gun was used. Stuckey stipulated that all entry wounds were from the front. One .38 caliber bullet was recovered from Darbins' body, and came from a preexisting wound.

In November of 2000, FBI agents searched the house where Felder said Stuckey killed Darbins, after Felder cooperated with the FBI. FBI agents removed carpeting, floor boards, and bullet slugs recovered from the floor and wall. Agents also discovered blood stains. Two .40 caliber bullets were lodged in the floorboards, a third bullet was found beneath the floorboards, and a .38 caliber bullet was found in the wall. DNA from blood on carpeting that the FBI agents removed matched Darbins' DNA, and fibers found on a shoelace with Darbins' body matched carpet fibers from the house.

The Government also introduced evidence in the form of handwritten rap lyrics composed by Stuckey, which the Government argued were akin to a confession: "I expose those who knows; Fill they bodys wit ho[l]es; Rap em up in blankit; Dump they bodys on the rode." The lyrics also repeatedly referred to killing and retaliating against "snitches."

Conspiracy to Distribute Cocaine and Cocaine Base

Willie Sinai Franklin, a cooperating witness for the Government and former Detroit drug dealer, testified extensively about Stuckey's involvement in a conspiracy to distribute cocaine and cocaine base.[4] Steven Felder also testified about Stuckey's involvement with the conspiracy.[5]

Conspiracy to Launder Monetary Instruments

The Government presented evidence that Stuckey purchased cars and real estate with the proceeds he made from selling cocaine in order to conceal the source of his income. Felder testified

---

[4]Franklin testified that he gave Stuckey two kilograms of cocaine in 1993 or 1994. Franklin testified that Stuckey was an "enforcer" in a gang known as the "Puritan Avenue Boys" (or, "P.A.s"), which Franklin testified had a reputation for drug trafficking and violence. Franklin testified that he once witnessed Stuckey beat with an Uzi an individual who allegedly had information about 18 missing kilograms of cocaine that belonged to associates of Stuckey. Franklin testified that Stuckey and Darbins were in the cocaine business together. Franklin also testified about a recorded telephone call between Franklin and another individual, Marty Wright, during which Wright told Franklin about Stuckey's cooking powder cocaine into crack.

[5]Felder testified that Stuckey supplied crack cocaine to Verdell Murrie who supplied Felder who then sold the crack cocaine. Felder testified that Stuckey was a member of the P.A.s, which he also testified was a gang that engaged in the trafficking of cocaine. Felder testified that after he was released from prison in March of 1996, Verdell Murrie told him that Stuckey had given Murrie 50 kilograms of cocaine to sell. Felder testified that he saw Stuckey possess kilograms of powder and crack cocaine. Felder testified that Stuckey told him that one of his sources for cocaine was in Atlanta, Georgia. Felder testified that on several occasions he brought, or witnessed other people bringing, large amounts of cash from the sale of cocaine to Stuckey.

that Stuckey owned and drove eight different cars. Franklin testified that in his experience, cocaine dealers owned vehicles registered in others' names to avoid detection by law enforcement.

Frank Scartozzi, a Special Agent with the IRS Criminal Investigation Division, testified about numerous financial transactions made by Stuckey that constituted proof of conspiracy to launder money.[6] Jack Harvey, a Special Agent with the DEA, testified about items seized from the Georgia apartment where Stuckey was arrested,[7] including over $13,000 in U.S. Currency, $169,000 in jewelry, and $20,000 in crocodile coats and hats.

Bart Bradley, a former police officer, testified that on May 15, 1996, Stuckey reported a break-in at his home in Atlanta. Bradley testified that Stuckey told him that missing items included fur coats, 18 pairs of alligator shoes worth between $500 and $800 per pair, and two pairs of cowboy boots.

Laundering of Financial Instruments

Stuckey was charged with and convicted of laundering of financial instruments in connection with Stuckey's attempt to purchase a car. Dwight Smith, an NFL football player who once scored

---

[6]Agent Scartozzi testified that Stuckey did not file personal income tax returns for the years 1992 through 1996 and 2002. Agent Scartozzi testified that Stuckey purchased a 1988 BMW titled in the name of someone else, and from that Scartozzi concluded that Stuckey was trying to conceal the fact that Stuckey was the true owner of the BMW. Agent Scartozzi also testified that Stuckey gave cash to third parties who purchased cashier's checks to purchase real estate in Atlanta. Agent Scartozzi testified that Stuckey made false statements about his annual income from Puritan Records, a record company with which Stuckey was involved, in order to hide money that Stuckey made from selling drugs. Agent Scartozzi testified that Stuckey purchased one vehicle with two cash payments of less than $10,000 that totaled over $10,000, in order to evade IRS reporting requirements, which Agent Scartozzi testified was consistent with money launderers' behavior.

[7]*See infra* pp. 8-11.

two touchdowns in the Super Bowl, testified that in July 2002, Stuckey gave him $40,000 in cash to purchase a Mercedes Benz. Smith testified that he purchased a cashier's check with the cash and then used the check to purchase the car. Smith then delivered the car to Stuckey, who thereafter retained possession of the car.

Witness Tampering

Stuckey was charged with and convicted of witness tampering for threats that he made to Felder while Felder was being held in custody. Felder testified that Stuckey showed up at the jail and threatened to kill Felder's family if he (Stuckey) was convicted of murdering Darbins. Felder's story was partly corroborated by the testimony of another security officer who was working at the jail, witnessed Felder's demeanor change dramatically after Stuckey met with Felder, and heard Felder say that Stuckey threatened him and his family.

Felon in Possession of a Firearm

Stuckey was charged with and convicted of being a felon in possession of a firearm in connection with an incident on March 7, 2000. On that date, police officers found a loaded .45 caliber Glock semiautomatic handgun in Stuckey's waistband.

Motion to Suppress

At approximately 12:00 p.m. on September 6, 2002, federal agents arrested Stuckey, who was then a fugitive, at an apartment in Lawrenceville, Georgia, a suburb of Atlanta. The apartment

was leased in the name of Paytra Chambers. Agents discovered Stuckey in the apartment along with two other individuals, and noticed a large amount of U.S. currency and jewelry and a marijuana cigarette in plain view.

DEA Agent Anthony Lockhart applied for a search warrant. The affidavit listed "marijuana" as the only item to be searched for and seized and stated that there was probable cause to believe that the crime of possession of marijuana had been committed based on the discovery of the marijuana cigarette.[8] A magistrate granted the search warrant, authorizing the search for and seizure of marijuana. The search warrant covered the apartment, curtilage, and vehicles maintained at the residence.

Federal agents then searched the premises. Agents also searched a vehicle located within the apartment's garage. Inside of the vehicle's trunk, agents found "a blue knapsack filled with paperwork, correspondence, [and] at least one address book . . . ." Agents seized some of these materials, including handwritten rap lyrics. Agents also seized the marijuana cigarette; U.S. currency; jewelry (including watches, chains, pendants, earrings, and a bracelet); a Louis Vuitton bag; a template for an anti-snitches t-shirt; cellular phones; and alligator jackets, hats, and a belt.

On November 18, 2003, Stuckey filed a motion to suppress all evidence seized during this search. Stuckey argued that the search warrant was issued without probable cause because the

---

[8]The affidavit contained printed language listing additional items to be searched for and seized, including plastic bags, scales, razor blades, documents relating to the sale of marijuana, and cellular phones, but it appears from the record that Agent Lockhart crossed-out those items, leaving only marijuana as the item to be searched for and seized.

discovery of a single marijuana cigarette did not suggest that other contraband was located in the apartment. Stuckey also argued that the search exceeded the scope of the search warrant because the warrant permitted only a search for marijuana, whereas the federal agents conducted a "Free For All" and seized other items that were not marijuana.

The Government filed a response, urging the district court to deny the motion to suppress for five reasons: (1) Stuckey failed to establish standing to challenge the search because he had no reasonable expectation of privacy in someone else's apartment; (2) the search warrant was supported by probable cause; (3) the agents who executed the search relied in good faith on the warrant; (4) the evidence seized was in plain view; and (5) the search of the vehicle was proper under the automobile exception to the warrant requirement.

During a hearing on the motion to suppress, the district court questioned Stuckey's rationale for suppressing the evidence, and stated that he would "have an opinion out on this." During a later pre-trial motions hearing, the district court stated that he had discussed certain issues with the attorneys in chambers, and said, "I've ruled on the suppression issues."

On July 8, 2004, after the trial had begun, the district court issued a written order denying Stuckey's motion to suppress.[9] The district court first held that Stuckey lacked a sufficient Fourth

---

[9]The district court found the following relevant facts, none of which Stuckey challenges as clearly erroneous: the apartment was leased to Paytra Chambers; Chambers gave Stuckey a key to the apartment in exchange for $2,000; Stuckey drove all night on September 5, 2002, arrived at the apartment at 6:00 a.m. on September 6, and then slept in the apartment; Stuckey used the apartment as a place to hide from the authorities while a fugitive; there is nothing in the record to indicate that Stuckey had an ongoing relationship with Chambers; there is nothing in the record to indicate that Stuckey had ever been in the apartment before September 6; and there is nothing in the record to indicate that Stuckey had any socially valuable purpose for his visit to the apartment.

Amendment privacy interest in the apartment to challenge the search. The district court held, in the alternative, that even if Stuckey had some diminished expectation of privacy in the apartment, that interest was "wholly extinguished" because Stuckey, at the time, was on supervised release. The district court also held that the discovery of the marijuana cigarette in plain view provided probable cause to support the search warrant, and even if it did not, it formed the reasonable suspicion necessary to search the apartment of someone on supervised release. The district court held that once the agents had authority to enter the apartment, the "plain view" doctrine permitted seizure of the non-marijuana items. Finally, the district court held that exigent circumstances justified the agents' search of the vehicle because the two other individuals present in the house could have driven the car away.

Sentence and Appeal

On July 22, 2004, a jury found Stuckey guilty on all counts. The district court sentenced Stuckey to life imprisonment on the murder and conspiracy to distribute cocaine and cocaine base counts, 240 months on each of the two money laundering counts to run concurrently, and 120 months on each of the felon in possession of a firearm and witness tampering counts to run concurrently. The court also sentenced Stuckey to terms of supervised release, ordered Stuckey to pay a $600 assessment, and ordered Stuckey to forfeit $13,441 in U.S. currency, assorted clothing items valued at $21,045, and assorted jewelry valued at $169,120.

Motion for New Trial

On December 8, 2004, Stuckey filed a motion for a new trial and/or for an evidentiary hearing. Stuckey argued that his due process rights were violated when the Government used and failed to correct purported false testimony given by the Wayne County Medical Examiner. After a hearing, the district court denied Stuckey's motion on December 14. The court held that Stuckey failed to comply with Federal Rule of Criminal Procedure 33(b) because he failed to file the motion within seven days after the verdict and because the motion was not grounded on newly discovered evidence. In the alternative, the court held that even if Stuckey's motion were timely, the court would deny the motion because the purported false testimony did not "in any substantive way, undermine the jury's verdict, nor [did] it even really impeach" the medical examiner.

On December 27, 2004, Stuckey filed a timely notice of appeal.

## II.

The district court arguably erred by denying Stuckey's motion to suppress, but any error was harmless beyond a reasonable doubt.

### A.    Procedure

As a preliminary matter, Stuckey argues that the district court erred because it failed to rule on his pretrial motion to suppress before the trial, in violation of Federal Rule of Criminal Procedure 12(d). The district court, however, did not err in that regard. Rule 12(d) states that "[t]he court must decide every pretrial motion before trial unless it finds good cause to defer a ruling" and that the court "must not defer ruling on a pretrial motion if the deferral will adversely affect a party's right

to appeal." Fed. R. Crim. Proc. 12(d). The district court filed a written order denying Stuckey's

motion to suppress on July 8, 2004, over two weeks after opening statements began on June 22,

2004. But the district court stated, during a June 16, 2004 motions hearing, that it had previously

advised the parties that it was denying the motion to suppress. The district court stated the following

prior to considering the separate admissibility of the rap lyrics found within the bookbag (discussed

below):

> We've discussed at least aspects of this in chambers. I want to have a complete
> discussion of this on the record. But it seems to me that the essential question here
> now that I've ruled – *now that I've ruled on the suppression issues*, it seems to be the
> essential question here is one of foundation; whether or not the government has
> evidence to link your client with the specific items that were found in the book, such
> that the jury can infer that they were, in fact, his, or that they, in fact, relate to his,
> in the case of lyrics, relate to his own experience.

JA 778 (emphasis added). This statement indicates that the district court had already denied

Stuckey's motion to suppress.[10]

Even assuming that the district court erred by issuing its ruling after the trial began, Stuckey

would not be entitled to the remedy that he seeks, namely, a new trial. Stuckey points out that

because the Government used the lyrics in its opening statement, had the district court ruled in favor

of Stuckey and granted the motion to suppress, the district court would have had to declare a

mistrial. But that is not what happened. The district court denied Stuckey's motion in a written

---

[10]The Government also argues that during the motion to suppress hearing, "the district court clearly indicated
that it was inclined to deny the motion." But as Stuckey correctly points out, an inclination to decide an issue one way
is not a ruling on that issue.

order. Stuckey does not explain, and we cannot fathom, how Stuckey was prejudiced by any purported delay on the part of the district court.

    B.    Merits

The search in this case was arguably valid under the Fourth Amendment because two factors, in combination, reduced Stuckey's expectation of privacy. An individual may only claim the protection of the Fourth Amendment if he has a legitimate expectation of privacy in the premises being searched. *See, e.g.*, *Katz v. United States*, 389 U.S. 347 (1967). First, he was in the apartment only for a brief period, and was using it to aid in the progress of his flight from authority. Second, he lacked the degree of privacy expected by a person who is not on supervised release.

We recognize that it would be an extension of prior precedent to uphold the search in this case on the basis of either factor independently. First, the facts regarding the length of stay and degree of control of the premises appear closer to cases in which a privacy expectation has been recognized than to those where there was no such legitimate privacy expectation. *Compare Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990) (overnight guest has a reasonable expectation of privacy), *and Stoner v. California*, 376 U.S. 483, 490 (1964) (hotel patrons protected), *and United States v. Allen*, 106 F.3d 695, 698 (6th Cir. 1997) (motel patrons protected), *with Minnesota v. Carter*, 525 U.S. 83, 91 (1998) (no legitimate expectation of privacy for short-term business guests who have no previous connection to the owner of the premises). Stuckey's relationship to the apartment in this case is arguably closer to that of a motel patron or an apartment sublessee than to a business visitor. Stuckey had paid Chambers, the lessee of the apartment, $2,000 in order to stay

- 13 -

at the apartment, he kept personal items—as well as evidence of crimes—in the apartment, there is nothing in the record to indicate that Stuckey used the apartment as a place of business, and he slept there.

However, because Stuckey's supervised release was conditioned on the right of probation officers to enter his premises without consent, his expectation of privacy was reduced. Whether Stuckey was in a home or a motel room, he lacked the reasonable expectation that law enforcement officers would not enter. His reasonable expectation was therefore arguably reduced to the same level as that of the business visitor in *Minnesota v. Carter*, albeit for a different reason.

We recognize that the terms of Stuckey's supervised release differ from those in *United States v. Knights*, 534 U.S. 112 (2001), relied upon by the district court. In *Knights*, the Supreme Court held that police needed no more than reasonable suspicion to search a probationer's house without a warrant where the probation order stated that the probationer agreed to "submit his person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." *Id.* at 114, 121. But the condition of Knights' probation permitted warrantless, suspicionless searches, whereas the condition of Stuckey's supervised release permitted only visits and confiscation of contraband in plain view. The Supreme Court in *Knights* relied on the broad conditions of Knights' probation, such that the reasoning of *Knights* would not by its terms apply to Stuckey's supervised release. Thus it would require an extension of *Knights* to reason that

Stuckey's supervised release, notwithstanding its limited terms, would deprive Stuckey of standing to challenge searches beyond those limits.

But *Knights* did hold that probation status did reduce the expectation of privacy, and it was otherwise a close question whether Stuckey's temporary fugitive stay in the apartment in question gave him a reasonable expectation of privacy. "Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." *Knights*, 534 U.S. at 119 (internal quotations omitted). Supervised release, like probation, is a form of criminal sanction and limits an individual's freedom. Although Stuckey's supervised release conditions did not authorize the search, the fact that Stuckey was subject to supervised release itself lessened Stuckey's expectation of privacy. Like the defendant in *Carter*, Stuckey was temporarily using an apartment other than his own. Although nothing in the record suggests that Stuckey was purely a business guest, Stuckey was using the apartment for the purpose of evading capture by the police, and so neither was Stuckey purely an overnight guest, like the defendant in *Minnesota v. Olson*. In *Olson*, the Supreme Court emphasized the "everyday expectations of privacy that we all share" and the "longstanding social custom [of being an overnight guest] that serves functions recognized valuable by society." 495 U.S. at 98. Sleeping at another's apartment in order to evade capture by police does not comport with our everyday expectations of privacy and is not a longstanding social custom. Thus, taking together the fact that the apartment was not Stuckey's and the fact that Stuckey was on supervised release, reasonable suspicion may have been enough to justify the search. Thus the reasoning of *Carter* and *Knights* together might warrant the conclusion that Stuckey lacked a reasonable expectation of privacy in the apartment in question in the circumstances of this case.

We need not rule definitively on the question, however, because even if there was a Fourth

Amendment violation that Stuckey could complain of, the error was harmless, as explained below.[11]

###### C.     Harmless Error

In any event, any error by the district court in denying Stuckey's motion to suppress was

harmless. Where a motion to suppress was improperly denied, this court reverses the defendant's

conviction unless the government can demonstrate that the error was harmless beyond a reasonable

doubt, or, in other words, that there is no reasonable possibility that the evidence might have

contributed to the conviction. *Chapman v. California*, 386 U.S. 18, 23-24 (1967); *see also United*

*States v. DeSantis*, 134 F.3d 760, 769 (6th Cir. 1998); *United States v. Robinson*, 430 F.2d 1141,

1144 (6th Cir. 1970); Fed. R. Crim. Proc. 52(a).

First, the district court's failure to suppress the rap lyrics was harmless with respect to

Stuckey's convictions for murder and witness tampering. Although the Government extensively

used Stuckey's lyrics against him at trial (as detailed throughout this opinion), not all of the lyrics

presented to the jury were discovered during the search of the Georgia apartment. The Government

also presented lyrics from an album that Stuckey released in 1997 that similarly discussed silencing

informants and having informants end up in the trunk of Stuckey's car. More important, Felder

provided eyewitness testimony about Darbins' murder. With respect to the witness tampering

---

[11]We do not uphold the search based on the presence of a search warrant (the terms of which appear to have
been exceeded), on the "plain view" doctrine as applied in *United States v. Blakeney*, 942 F.2d 1001, 1026-28 (6th Cir.
1991) (a case that in contrast involved a search warrant for documents rather than only for drugs), or on exigent
circumstances (given the apparent lack of imminent destruction of evidence).

charge, Felder and a security officer at the jail testified about the incident in the jail that formed the basis for the witness tampering charge. Thus, there was ample evidence for a jury to convict Stuckey of these charges, and any error in admitting the challenged rap lyrics was harmless.

Second, the district court's failure to suppress the other items seized during the search of the Georgia apartment (e.g., cash, jewelry, and clothing) was harmless with respect to Stuckey's conviction for conspiracy to launder monetary instruments. Agent Scartozzi testified at length about Stuckey's finances and other evidence of unexplained wealth (e.g., cars and real estate). Officer Bradley also testified about evidence of unexplained wealth connected to Stuckey. Therefore, the additional evidence of unexplained wealth seized from the Georgia apartment was harmless.

Finally, neither the rap lyrics nor the other evidence seized were relevant to the other charges against Stuckey.[12] Therefore, the admission of the evidence seized from the Georgia apartment was harmless with respect to Stuckey's convictions for conspiracy to distribute cocaine and cocaine base, felon in possession of a firearm, and laundering of financial instruments.

## III.

The district court did not err by admitting the rap lyrics into evidence. This court will not reverse a district court's decision to admit evidence unless the district court abused its discretion. *See, e.g., Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141-42 (1997). The Government argues that the

---

[12]There was one rap lyric that overtly referred to drug dealing: "2 keys of raw we holdin; 100 bricks a week we movin." Agent Scartozzi testified that this referred to the sale of cocaine. However, in light of the extensive testimony by Felder and Franklin about Stuckey's involvement with the distribution of cocaine, the introduction of this isolated lyric, which the Government did not emphasize, was harmless error, at most.

lyrics were properly admitted as party admissions pursuant to Federal Rule of Evidence 801, a proposition that Stuckey does not challenge on appeal. Stuckey argues instead that the lyrics were irrelevant, improper evidence of prior bad acts, and substantially more prejudicial than probative, and should have been excluded under Federal Rules of Evidence 401, 404(b), and 403, respectively.

First, Stuckey's rap lyrics were relevant evidence. Relevant evidence is that evidence tending to make the existence of a fact more or less probable, Fed. R. Evid. 401, and is admissible (unless the evidence is inadmissible under another rule), Fed. R. Evid. 402. The district court held that the lyrics were relevant, stating, "You can certainly not say when somebody writes about killing snitches, that it doesn't make the fact that they may have killed a snitch more probable . . . ." Stuckey's lyrics concerned killing government witnesses and specifically referred to shooting snitches, wrapping them in blankets, and dumping their bodies in the street—precisely what the Government accused Stuckey of doing to Darbins in this case. Therefore, the district court did not abuse its discretion by holding that the lyrics were relevant.

Second, the district court did not abuse its discretion by holding that the lyrics were admissible, notwithstanding Federal Rule of Evidence 404(b). "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." Fed. R. Evid. 404(b). The district court held that the rap lyrics were "not evidence of a prior act [but instead] evidence of statements about a certain characterization or certain genre of people. In the case of snitches, a certain genre of people. It's simply a prior statement." The district court also concluded

that even if the lyrics were evidence of prior bad acts, they would have been admissible to show knowledge, preparation, plan, and arguably modus operandi. The Government introduced the rap lyrics not to show that Stuckey was of a bad character or had a propensity for violence (or another bad character trait), but to show that he killed Darbins. Statements that Stuckey dislikes and kills "snitches," fills their bodies with holes, wraps them in blankets, and dumps them in the road provides direct evidence that Stuckey shot Darbins, wrapped his body in blankets, and dumped it in the road. Had Stuckey rapped, "I shot Darbins, wrapped him in a blanket, and dumped him in the road," the lyrics would clearly be admissible evidence just as if he had made the same statements to a third party. The difference in specificity between those hypothetical lyrics and the lyrics actually written by Stuckey is a matter of degree and goes to the strength of the evidence, which the jury was in the proper position to determine. Therefore, the district court did not abuse its discretion by holding that the lyrics were not inadmissible under Rule 404(b).

Third, the district court did not abuse its discretion by ruling that the prejudice of the lyrics did not substantially outweigh their probative value. Federal Rule of Evidence 403 permits a district court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Stuckey argues that the lyrics were fictional, and that their admission unfairly prejudiced him because of their use of "extreme words and imagery" and "graphic" language. The district court held that the lyrics were not inadmissible under Rule 403 and that it would give a limiting instruction to the jury and conduct voir dire so "the jury will understand that we don't convict people for murder simply because they have written lyrics about murder." As the district court recognized (at least implicitly), admission of Stuckey's rap lyrics involved some

danger of unfair prejudice. A juror, after hearing profane, offensive, and violent rap lyrics written by a defendant, might conclude that the defendant is a bad person and might be more willing to convict on that impermissible ground. But in *United States v. Caver*, this court held that the district court did not plainly abuse its discretion by admitting letters of low probative value that used "foul language and derogatory terms." 470 F.3d at 240-41. Given the higher probative value of Stuckey's rap lyrics, the district court did not abuse its discretion by holding that the danger of unfair prejudice did not substantially outweigh the lyrics' probative value.

Stuckey seeks support in two cases from outside of this circuit for his position that the district court should have excluded the lyrics. In *United States v. Foster*, the Seventh Circuit held that the rap lyrics, "Key for Key, Pound for Pound I'm the biggest Dope Dealer and I serve all over town. Rock 4 Rock Self 4 Self. Give me a key let me go to work more Dollars than your average business man," were admissible under Rule 404(b) for the purpose of showing that the defendant was "familiar with drug code words and, to a certain extent, narcotics trafficking." 939 F.2d 445, 455-57 (7th Cir. 1991). Arguably, the Seventh Circuit cursorily hinted (in dicta) that had the Government sought to admit the lyrics to prove that the defendant was the "biggest dope dealer," the result might have been different. But as the Government points out, the district court admitted Stuckey's rap lyrics, not as fiction, but as fact—autobiographical statements of acts relevant to the case.

Stuckey relies on *State v. Hanson*, 731 P.2d 1140 (Wash. App. 1987). In *Hanson*, the state court of appeals held that the defendant's violent fictional writings were inadmissible to show that

the defendant had a propensity for violence. *Id.* at 1144. Here, the Government did not introduce Stuckey's rap lyrics as evidence that Stuckey is a violent person, but as evidence that Stuckey murdered Darbins. If, in *Hanson*, the defendant's writings had stated that he robbed a 7-11 and shot the clerk in the abdomen (as the defendant had been accused of doing), surely the case would have come out differently.

Finally, the district court did not plainly err by failing to give a limiting instruction to the jury.[13] Absent evidence in the record that the district court declined to make such instructions after Stuckey requested them, this court reviews the omission only for plain error. *See United States v. McCall*, 85 F.3d 1193, 1196 (6th Cir. 1996). This court reverses under the plain error standard of review only if "(1) there is an error; (2) that is plain; (3) which affected the defendant's substantial rights; and (4) that seriously affected the fairness, integrity or public reputation of the judicial proceedings." *United States v. Swanberg*, 370 F.3d 622, 627 (6th Cir. 2004) (quotations omitted). Any error by the district court did not affect Stuckey's substantial rights or seriously affect the fairness of his trial because it is unlikely that any reasonable juror would have been unduly influenced by the violent or profane nature of Stuckey's rap lyrics. Rap is no longer an underground phenomenon and is a mainstream music genre. Reasonable jurors would be unlikely to reason that

---

[13]The Government claims that Stuckey twice declined the district court's offer to give such instructions, but the record does not support such a contention. Stuckey's attorney first declined the district court's offer to question a jury panel during voir dire, but that panel was later dismissed. The second incident that the Government refers to was simply a statement by Stuckey's attorney that he understood the district court's statement that the court would later consider giving a limiting instruction. Stuckey is likewise incorrect in asserting that the district court "ruled that it would give an appropriate limiting instruction to the jury [but] failed to do so." Stuckey refers to the district court's decision to admit the rap lyrics (the second incident referred to by the Government above). The district court merely stated that it would "consider" a limiting instruction and "possibly" an instruction on conditional relevance, and prefaced its statement of the grounds for the instruction by stating, "let me phrase this as precisely as I can *to assist you in drafting the instruction*." (emphasis added).

- 21 -

a rapper is violent simply because he raps about violence. Therefore, the district court did not plainly err by failing to give a limiting instruction sua sponte.

**IV.**

The AUSA engaged in seven acts of at least arguable misconduct, none of which was flagrant and none of which requires a reversal of Stuckey's convictions. To determine whether a prosecutor's remarks or conduct require a new trial, this court first asks whether the remarks or conduct were improper, and if so, then asks whether the remarks or conduct were sufficiently flagrant to warrant reversal. *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994); *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006). With respect to the flagrancy determination, this court considers four factors: "(1) whether the evidence against the defendant was strong, (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally." *Slagle*, 457 F.3d at 516; *accord Carroll*, 26 F.3d at 1385. If the remarks or conduct were not flagrant, then this court may require a new trial only if "(1) the proof against the defendant was not overwhelming, (2) opposing counsel objected to the conduct, and (3) the district court failed to give a curative instruction." *United States v. Dakota*, 197 F.3d 821, 828 (6th Cir. 1999).

A.      *Improper Comments*

Seven of the AUSA's comments or actions during the course of Stuckey's trial were improper or of questionable propriety. Stuckey divides the comments and actions into five categories: (1) arguing facts not in evidence; (2) failing to provide evidence to the defense; (3) bolstering or vouching for witnesses; (4) improperly commenting on Stuckey's character or testimony; and (5) eliciting testimony about Stuckey's affiliation with a gang.

    *1.      Arguing facts not in evidence in opening and closing statements*

Four of the AUSA's comments or actions improperly referred to facts not in evidence. Four other comments that Stuckey argues were improper were not improper.

First, the AUSA's implication that Stuckey admitted to killing Darbins was arguably improper. The AUSA said the following during his closing argument:

> Interesting thing about Mr. Stuckey's testimony. He told you as he pretended to be crying up there. 'You weren't crying when you shot him in the face, were you?' Mr. Stuckey said, 'no, but I cried the next day when I heard about it on the news and they said maybe his friends did it.' Ladies and gentlemen of the jury, that was impossible. Ricardo Darbins' body wasn't identified until August 8 of '96, two days later. He was unknown male 107. There was no news report.

JA 2552-53. The AUSA's comment did somewhat misrepresent Stuckey's testimony. The AUSA asked Stuckey during cross-examination, "Were you crying the night you shot Ricardo Darbins in the face?" Stuckey replied, "I was crying the next morning that I found out he was killed." The AUSA and Stuckey then repeated this exchange using slightly different wording. But in answering the AUSA's question, Stuckey never prefaced his answers with the word "no." The AUSA's statement was arguably improper because it mischaracterized Stuckey's testimony. *See, e.g.*, *Hodge*

*v. Hurley*, 426 F.3d 368, 380-83 (6th Cir. 2005); *United States v. Turner*, 134 F. App'x 17, 24 (6th Cir. 2005) (unpublished).

The statement, however, was not flagrant. The mischaracterization was slight at worst, and it is highly doubtful that any reasonable juror would have taken that statement to mean that Stuckey confessed to shooting Darbins when Stuckey explicitly denied doing so.

Second, the AUSA's reference to the lack of news reports in the above-quoted statement from the AUSA's closing argument was improper because it was not supported by facts in evidence. The statement was not flagrant because the other evidence against Stuckey with respect to the murder charge, Felder's eyewitness testimony, was strong. Therefore, Stuckey was not prejudiced by this improper impeachment of his explanation of when he cried. The statement also does not require a new trial because, even though Stuckey's counsel objected, arguing that no evidence about a lack of media reports was presented by the AUSA, the district court instructed the jury "to be guided by your own recollection."

Third, the AUSA arguably improperly objected during Stuckey's closing statement by telling the jury that Stuckey could appeal. The exchange went as follows:

> MR. CHAMBERS [Stuckey's counsel]: I suggest to you it's even something maybe more serious than that. Because if you got a bad house, sell it, get rid of it. Lemon for a car, trade it in. Short of your religious beliefs, if you're married, you can, of course, get a divorce. But your decision as relates to Mr. Stuckey on the facts is final.
>
> MR. BUCKLEY: Objection. There's always the Court of Appeals.

MR. CHAMBERS:  I said on the facts, judge.

JA 2535.  A prosecutor's remark to the jury that the defendant's sentence ultimately will be decided

by another body, at least with respect to death sentences, is improper if the remark is untrue.  *See*

*Buell v. Mitchell*, 274 F.3d 337, 353 (6th Cir. 2001) (quoting *Caldwell v. Mississippi*, 472 U.S. 320

(1985)).  If this rule applies to non-death convictions as well, then the AUSA's comment might be

considered improper, although the comment technically may be true because the court of appeals

reviews a defendant's conviction for sufficiency of the evidence.  Even so, the comment was not

flagrant because it was brief, isolated, and was unlikely to have prejudiced Stuckey.  In addition,

reversal of Stuckey's convictions is not warranted because Stuckey's counsel failed to object.

Fourth, the AUSA's attempt to show posters consisting of enlarged versions of some of

Stuckey's rap lyrics to the jury was improper.  Although a district court has discretion to permit

counsel to present demonstrative evidence to the jury during closing statements, *see United States*

*v. Tarwater*, 308 F.3d 494, 516 (6th Cir. 2002), the AUSA's attempted use of the posters here was

improper because he failed to obtain permission from the district court prior to using the posters.

The district court, sua sponte, questioned the propriety of using this demonstrative evidence and did

not permit the AUSA to continue displaying the posters because the AUSA failed to request

permission in advance.

The improper use of the posters was not flagrant because the AUSA displayed the posters

to the jury for only a short period of time, the error was inadvertent, and the posters displayed the

rap lyrics, which were already in evidence. In addition, reversal of Stuckey's convictions is not warranted because Stuckey's counsel failed to object.

Four other statement that the AUSA made were not improper. First, the AUSA's reference to Stuckey's having shot Darbins in the face, even though Felder testified that Stuckey did not do so, was supported by the evidence because Dr. Schmidt, the Wayne County Medical Examiner, testified that Darbins had been shot four times in the head from the front or right side (i.e., to the face), including one shot to the mid-forehead.

Second, Stuckey argues that the following statement by the AUSA was improper:

> You have to remember that when Ricardo Darbins' body was found on August 7 of '96, no one knew who he was. He was unidentified unknown male 101, wrapped in a comforter sheet and plastic, tied up. No one knew until October of 2000 what Steven Felder said. So that was corroborated.

JA 2546. Stuckey argues that these statements were false because the Detroit Free Press printed an article on August 8, 1996, which identified Darbins as the victim of a shooting and indicated that the article's writer had interviewed Darbins' family and attorney on August 7. The statements were proper. The AUSA only stated that Darbins was unidentified on August 7, which was supported by Dr. Schmidt's testimony that when Darbins' body was delivered to the morgue for examination on August 8, it was reported as "an unknown body."

Third, Stuckey argues that the AUSA improperly referred to Stuckey's rap lyrics as Stuckey's "confession" to killing Darbins. In his opening statement, the AUSA referred to Stuckey's lyrics and stated, "They're almost a confession." During closing argument, the AUSA

- 26 -

referred the jury to Stuckey's lyrics and stated, "You can call them lyrics, you can call them his impressions. You can call them a confession. They're autobiographical. They were written voluntarily, his words." These statements were not improper because they were merely characterizations of the evidence and thus argument to the jury, not statements of facts not in evidence.

Finally, Stuckey argues that the AUSA's reference to an admission by Stuckey that there were bullet casings from an AK-47 at the scene of an earlier shooting involving Stuckey[14] referred to facts not in evidence. The AUSA stated the following:

> Even Mr. Stuckey admits, finally, that there were casings out there, after all those questions about there were no casings to the AK-47 found out there at the scene. Lo and behold, Mr. Stuckey testifies and says, 'well, that gun was fired out there.' Now his version of it is a little bit different.

JA 2488. After Stuckey's counsel objected on the grounds that Stuckey never said that there were AK-47 casings on the ground, the district court admonished the jury to "be guided by its own recollection of the evidence." The AUSA then continued, "Mr. Stuckey told you he was shot by this ipso facto; that means this gun was fired; that means there were casings out there. And I just said, Mr. Stuckey's version of it differed a little bit." The AUSA's statement was not improper. Counsel may draw reasonable inferences from the evidence, *Slagle*, 457 F.3d at 519, and it is reasonable to

---

[14]According to police officers who were present, on December 28, 1997, Stuckey shot at police officers with an AK-47, and police officers returned fire. Stuckey was shot by the officers. Officers recovered an AK-47 at the scene and also a handgun from Stuckey's waistband. Stuckey was charged with assault with intent to commit murder but acquitted. Stuckey later sued the officers over the shooting and received a settlement. An important issue in the case was the lack of AK-47 shell casings found on the scene.

infer that Stuckey admitted casings were on the scene from the fact that Stuckey admitted that the AK-47 was fired.

### 2.    Missing evidence

Stuckey's argument that certain purported "missing evidence" provides the foundation for a *Brady* violation is misplaced. Stuckey alleges that the Government committed misconduct when it "failed to test and produce at least one bullet (Q39.1) and at least three of the ten floorboards seized from the room in the Monterey house where Darbins was shot." Stuckey argues that the characteristics of the bullet and any evidence present on these floorboards was information that the Government was required to disclose pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).

Stuckey states in his brief that the Government listed "all ten (10) floorboards as being part of" Exhibit 45. He then points to the testimony of FBI Special Agent James Peterka, who testified from a photograph of the floor that "[i]t looks like seven boards were removed" and referred another time to "the seven boards." The Government explains this purported discrepancy by noting that Agent Peterka was "speaking loosely" and that the exhibit consisted of ten floorboards arranged in seven rows. Regardless of whether the Government's characterization of the evidence is correct, Stuckey has not demonstrated a *Brady* violation on the part of the Government because he has not met his burden of showing that the three purportedly missing floorboards were evidence favorable to the defense, and, consequently, that the evidence was material. *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). Similarly, Stuckey has not shown that the purportedly missing bullet, Q39.1, was material evidence favorable to the defense.

3.      *Improper bolstering or vouching of government witnesses*

Two of the AUSA's statements that Stuckey argues were improper bolstering or vouching were indeed improper (or arguably improper), while three other statements were not improper. "Bolstering occurs when the prosecutor implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury." *United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999). "Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness." *Id.* at 550.

First, the AUSA improperly bolstered Felder's credibility during his closing argument when he stated the following:

> Steven Felder was an individual who had information concerning serious federal crimes. The most telling thing is, Mr. Chambers says, well, we asked Steven Felder about those buys in November of '96 and he said he didn't know anything about it. That's because, to this day, Steven Felder doesn't know he sold to an undercover agent because we never told him, because we don't tell these people what to say. We do not give them information. We hear it from them. So it shouldn't surprise you Steve Felder's not even aware he sold to undercover agents November 6 '96. . . . And Agent Rannazzisi told you other things happened and got in the way and that they never prosecuted Steven Felder, because on April 15 of 1997, the ATF caught him . . . .

JA 2541-42. This statement was improper bolstering because the AUSA sought to support Felder's credibility by referring to facts not in evidence (e.g., that Felder did not know that he sold drugs to an undercover agent because the government did not tell him). *See Francis*, 170 F.3d at 551.

- 29 -

However, this statement was not flagrant. The statement was isolated, defense counsel invited the statement, and the statement referred to a collateral matter and was not prejudicial. The AUSA's statement was apparently made to rebut the suggestion made by Stuckey's counsel that Felder lied about not selling drugs to undercover agents even though DEA Special Agent Joseph Rannazzisi testified that the DEA never indicted Felder after Felder sold drugs to an informant. The Government notes that Stuckey's counsel improperly argued facts not in evidence when he suggested that the DEA permitted Felder to "walk" in exchange for testifying against Stuckey. The jury, therefore, likely was not led astray by the AUSA's improper statement because the AUSA was responding to defense counsel's improper remark. *See United States v. Young*, 470 U.S. 1, 12 (1985). In addition, the non-flagrant statement does not require a new trial because Stuckey's counsel failed to object. *See Dakota*, 197 F.3d at 828.

Second, the AUSA's reference during opening argument to two bullet holes in the wall of the house where Darbins was shot, even though Felder testified that there were three bullet holes in the wall, was arguably improper. Stuckey's argument does not appear to be that these statements were bolstering or vouching, but instead that the statements were mischaracterizations of the evidence. Still, the only portion of the record that Stuckey refers to is where the AUSA stated in his opening argument the following: "And you're going to learn there was, not one, but two stray bullet holes in the wall, a .38 caliber found in the wall, again, four years later, and there was another through and through hole in the wall." The Government argues that this statement indeed refers to three bullets holes: the "two stray bullet holes" and "another through and through hole." Perhaps this is what the AUSA meant, but a more straightforward way of reading that statement is that the

".38 caliber found in the wall" and the "through and through hole" were descriptions of the "two stray bullet holes."  In any event, the comment was not flagrant because the comment was, at the worst, a minor error in describing the evidence, and it was not prejudicial because it was an isolated reference during opening statements.

The other comments that Stuckey alleges were improper were not improper.  First, Stuckey argues that in the AUSA's closing statement, the AUSA improperly asserted that Stuckey's rap lyrics corroborated Felder's testimony.  But improper vouching only occurs when the prosecutor asserts a personal belief in his or her witness's testimony, not when the prosecutor argues that other facts in evidence support or corroborate that testimony. *See Francis*, 170 F.3d at 550.  The AUSA's statement was thus proper.

Second, Stuckey argues that the AUSA improperly attempted to impeach his own witness, FBI Agent Douglas Murphy.  After Stuckey's counsel elicited an admission from Agent Murphy that there "would have been . . . at least three" guns to have fired all of the bullets recovered at the house where Darbins was murdered, the only question that the AUSA asked of Agent Murphy was whether he was at the house on August 6, 1996.  This was not improper vouching or bolstering, but simply impeachment, which the Federal Rules of Evidence explicitly permit.  Fed. R. Evid. 607 ("The credibility of a witness may be attacked by any party, including the party calling the witness.").

Finally, Stuckey argues that the AUSA improperly bolstered the testimony of Willie Sinai Franklin by using leading questions and that the use of the leading questions were an attempt by the

AUSA to communicate to the jury information not in evidence. "[T]he use of leading questions during the direct examination of a witness falls within the sound discretion of the trial court." *United States v. Shoupe*, 548 F.2d 636, 641 (6th Cir. 1977); *see also* Fed R. Evid. 611. The district court reminded the AUSA not to use leading questions in response to a hearsay objection made by Stuckey's counsel, but Stuckey's counsel failed to object to the continued use of leading questions, and the district court did not prevent any of the AUSA's later leading questions. There is, however, nothing in the transcript from which one could draw a conclusion that the AUSA was attempting to use the leading questions to improperly communicate information to the jury. Therefore, the AUSA's questioning was not improper.

> 4. *Improper comments about Stuckey's testimony and character*

Only one remark that Stuckey claims was an improper comment about his testimony and character was indeed improper. The AUSA improperly referred to his own personal knowledge during the following exchange with Stuckey:

> Q: Well, one other thing. You did say, hey, if you were involved with Willie Sinai Franklin, why weren't you indicted, right?
>
> A: Yes. I said that.
>
> Q: But you're indicted as you sit here today, aren't you?
>
> A: I'm indicted on some bull crap, yeah.
>
> Q: Testified that you had never seen Alfornia Johnson in your life; is that right?
>
> A: Never.
>
> Q: You're saying he's a liar, too; is that right?
>
> A: Sir, you know I don't know that man.

> Q:    *Mr. Stuckey, I'd love to tell you what I know, but I can't.* You're calling Alfornia a liar, aren't you?
>
> A:    Yes, sir.  Yes, sir.

JA 2426 (emphasis added).  The AUSA's remark in italics was improper because it implied that the AUSA had personal knowledge about Stuckey that the jury would not hear.  *See Berger v. United States*, 295 U.S. 78, 87-88 (1935).  This remark, however, was not flagrant.  The AUSA was responding to an improper suggestion by Stuckey that the AUSA did not know certain information.  *See Young*, 470 U.S. at 12.  Also, as the Government asserts, the comment was vague.  Unlike in *Berger*, where a prosecutor made an explicit statement that he knew specific information that contradicted a witness's testimony, here, the AUSA's remark was vague and general and thus was unlikely to have led the jury astray or prejudiced Stuckey.

The other statements that Stuckey complains of were not improper.  First, Stuckey argues that another exchange between the AUSA and Stuckey, which began with the AUSA questioning Stuckey about whether he reported certain income, was improper:

> A:    I couldn't report the money that I had made because I was locked away and I couldn't have a tax person come and visit me so I can take care of all that in the proper way.
>
> Q:    Wait a minute.  You have lawyers come visit you all the time, don't you?
>
> A:    My lawyers were not allowed to come see me for five, six months, sir.  You know that.
>
> Q:    No, I don't know anything like that.
>
> A:    No lawyer was allowed to come see me for quite a while.
>
> Q:    You want to talk about why that was?
>
> A:    If you ask me the question, sir.

Q:     Careful what you pray for. *That was for security reasons, wasn't it?*

MR. CHAMBERS:    I object to commentaries. He is to ask questions.

THE COURT:       I'm going to caution you, Mr. Stuckey, be very careful how you testify about things.

JA 2396-97 (emphasis added). The AUSA's comment was not improper or flagrant because it referred to a matter that was not clearly off-limits for purposes of cross-examination, Stuckey opened the door by stating that he would talk about why his lawyers were not permitted to visit him in prison, and the comment was vague and did not suggest that the security reasons were due to the fact that Stuckey allegedly attempted to hire someone to kill Felder's mother to keep Felder from testifying or otherwise due to facts specific to Stuckey (in other words, the "security reasons" could have applied to all prisoners).

Second, Stuckey argues that the AUSA acted improperly when he argued to the jury that one could not blame Stuckey for acting arrogant (as a witness had testified) because Stuckey had "beat[] the system several times" and had "[l]iterally gotten away with murder." The AUSA then quoted Stuckey's rap lyrics. Stuckey does not explain how these statements were improper other than to say that they were an "attack on Stuckey's character." The AUSA's statement was not improper because it was merely argument based on facts in evidence, including the rap lyrics and testimony that Stuckey previously was acquitted of other charges or had convictions reversed.

    5.    *Testimony about P.A. Boys*

Testimony presented by the Government about Stuckey's affiliation with an alleged gang known as the "Puritan Avenue Boys" (or "P.A. Boys") was proper. Stuckey argues that the

testimony was irrelevant, more prejudicial than probative, and improperly used to inflame the passions of the jury. The testimony was relevant because, as the Government argues, it was necessary to authenticate and tie the rap lyrics to Stuckey, and the lyrics and the album credits contain multiple references to "Puritan Boys" or "P.A." The district court did not plainly abuse its discretion by not excluding this testimony, where Stuckey failed to object, because the probative value was not substantially outweighed by any danger of unfair prejudice. *See United States v. Caver*, 470 F.3d 220, 240-42 (6th Cir. 2006). Finally, there is nothing about the testimony that would make it improper given that the testimony was permissible under Rule 403.

## B. Flagrancy

Overall, seven statements or actions of the AUSA were either improper or arguably improper.[15] Although none of these statements or examples of conduct was flagrant and does not require that this court grant Stuckey a new trial, Stuckey argues that all of the improper comments combined were flagrant and require reversal. Considered as a whole and in context, the combined effect of the AUSA's misconduct was not flagrant and does not require reversal of Stuckey's convictions. The comments and conduct were, for the most part, isolated; three of the comments were in response to improper remarks or conduct by Stuckey or Stuckey's counsel; and the

---

[15]Those statements were: (1) the AUSA's slight mischaracterization, during closing arguments, of Stuckey's testimony that he cried the day after Darbins was killed; (2) the AUSA's reference to a lack of news reports; (3) the AUSA's objection during closing arguments where he implied that the court of appeals could correct errors by the jury; (4) the AUSA's use of blown-up versions of Stuckey's rap lyrics during closing arguments without obtaining permission from the district court; (5) the AUSA's reference to two bullet holes during opening statements; (6) the AUSA's vouching for Felder during closing arguments; (7) the AUSA's statement to Stuckey during cross-examination, "I'd love to tell you what I know, but I can't."

impropriety of three of the comments was slight or debatable.  The evidence against Stuckey was relatively strong, consisting of eyewitness testimony and extensive testimony about Stuckey's financial transactions.  Taken together in the context of a nineteen-day trial that involved over seventy witnesses, the comments were not flagrant.

Also, we do not reverse Stuckey's conviction on the basis of non-flagrant misconduct because Stuckey's counsel failed to object to six of the incidents, and the district court gave a curative instruction in response to an objection by Stuckey's counsel to the other incident.  *See Dakota*, 197 F.3d at 828.

## V.

It is appropriate in this case to adhere to the "general rule [that] a defendant may not raise ineffective assistance of counsel claims for the first time on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations." *United States v. Wunder*, 919 F.2d 34, 37 (6th Cir. 1990).  First, several of Stuckey's arguments for why his trial counsel was ineffective involve his counsel's failure to call certain individuals as witnesses.  But Stuckey does not refer this court to anything in the record that indicates what testimony these witnesses would have provided, and instead only alleges what these witnesses would have said.  Second, Stuckey argues that his trial counsel was ineffective for failing to investigate an FBI laboratory report concerning a bullet found at the scene of the crime and for failing to produce a copy of a newspaper article that allegedly refuted arguments that the AUSA made during cross examination and closing arguments.  But the record does not reflect the extent

to which Stuckey's trial counsel investigated either of these matters. *See United States v. Crowe*, 291 F.3d 884, 886 (6th Cir. 2002) ("[T]he record [does not] reflect[] the extent to which Crowe's counsel investigated the charges . . . ."). Finally, Stuckey argues that his trial counsel was ineffective for failing to file a timely motion for a new trial. We decline to address this argument as well, and defer consideration of the argument, along with the other arguments, until a § 2255 motion is filed.

## VI.

Stuckey's trial did not violate due process. Individually non-prejudicial errors, when taken together, may result in a fundamentally unfair trial that violates a defendant's due process rights. *See United States v. Pierce*, 62 F.3d 818, 834-35 (6th Cir. 1995). As previously discussed, there were seven examples of misconduct (or possible misconduct) by the AUSA and the district court arguably erred by denying Stuckey's motion to suppress. However, as also discussed above, the seven examples of misconduct, taken together, were not flagrant and did not require a new trial, and any error by the district court in denying Stuckey's motion to suppress was harmless beyond a reasonable doubt. Neither does the accumulation of these errors rise to the level of a due process violation.

## VII.

For the foregoing reasons, we AFFIRM Stuckey's convictions.

RYAN, Circuit Judge, concurring. While I concur in my colleagues' decision to affirm Thelmon Stuckey's convictions, I do not agree that the circumstances of Stuckey's stay at his friend's apartment in Georgia, combined with the terms of his supervised release, stripped him of his Fourth Amendment standing to challenge the seizure of the papers in the backpack on which the rap lyrics were written. I am convinced that the rap lyric papers were seized in violation of Stuckey's constitutional rights under the Fourth Amendment, but I also think that the trial court's refusal to suppress the challenged lyrics was harmless error, beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 23-24 (1967).

## I.

The law seems to be well settled that whether a defendant has standing to bring a constitutional challenge for police invasion of his private sleeping room, depends, in part, upon whether he is an invited overnight guest in a private dwelling (or a hotel patron), or merely a "casual visitor" occupying a premises, including a private dwelling or a hotel room, for the primary purpose of utilizing the premises as a temporary "hide-out" or to conduct a business transaction. See, e.g., Minnesota v. Carter, 525 U.S. 83, 90, 107 (1998); Minnesota v. Olson, 495 U.S. 91, 96-97 (1990); United States v. Allen, 106 F.3d 695, 699 (6th Cir. 1997). Generally, the former has a legitimate expectation of privacy, and therefore, standing to assert a constitutional privacy deprivation under the Fourth Amendment, and the latter has not.

The district court found that: (1) Stuckey paid the apartment owner $2,000 and obtained a key for the use of the apartment for an undetermined duration; (2) at the time of his arrest, Stuckey

had been asleep in the apartment for several hours; and (3) he had various articles of personal property in the apartment, including clothing hanging in a closet and several items of jewelry.

There was no finding—and there is no evidence—that Stuckey was using the apartment merely for a business transaction of any kind, legal or illegal. In my judgment, the district court's findings compel us to conclude that Stuckey's occupancy of his friend's apartment more closely resembles an overnight guest or hotel patron than a "casual visitor" conducting a business transaction. See Carter, 523 U.S. at 90, 107. And I cannot agree that Stuckey's status on supervised release diminished, in any respect, his standing to challenge the search of his vehicle and backpack, and the seizure of the "bundle of papers" in which the rap lyrics were found.

Accepting, as we must, under United States v. Knights, 534 U.S. 112 (2001), that the terms and conditions of one's supervised release could diminish his expectation of privacy in his sleeping rooms, such as to eliminate his Fourth Amendment rights, Stuckey's situation was not such a case. In Knights's case, the terms of his supervised release authorized the police to conduct a search of any place where Knights might be found, with or without a search warrant; Stuckey's supervised release terms permitted only "a probation officer to visit at any time at home or elsewhere and [required Stuckey to] permit confiscation of any contraband observed in plain view by the probation officer." (Emphasis added.)

In my judgment, we ought to decide whether the search of Stuckey's vehicle and backpack and seizure of the papers exceeded the scope of the warrant authorizing the search. I believe it did. The warrant authorized a search for "marijuana" and nothing else. Indeed, the magistrate, or

someone at the magistrate's direction, struck from the affidavit language which would have allowed a search for "documents" or other evidence of marijuana possession.

Since the seizure of personal papers was not expressly authorized by the search warrant, their seizure was lawful only if the papers on which the rap lyrics were in "plain view" and their incriminating nature was "immediately apparent." United States v. Calloway, 116 F.3d 1129, 1133 (6th Cir. 1997). The papers "bundled together" in the backpack bore various handwritten and printed words and facially gave no indication of any relationship to marijuana, or any other crime. It was not until after the papers were seized, and the language of the text analyzed and interpreted as rap lyrics by someone other than the seizing officer, and after that, connected to Darbins's death, that the lyrics were first adjudged an incriminating admission. Even if it were conceded that the papers bearing the rap lyrics were in plain view (a doubtful proposition), it is clear that it was not "immediately apparent" to the seizing officer that the papers were plainly incriminating. It would be quite a different case if the writing on a sheet of paper immediately observable to the officer upon opening the backpack stated: "I, Stuckey, killed Darbins, the snitch," or something of the sort. In such a case, there would be no analytical second step necessary to appreciate the incriminating character of the words written on the paper. But in Stuckey's case, the words on the papers were meaningless until a police officer or someone else in authority took the analytical "second step" of interpreting the words as rap lyrics having something to do with a homicide of a "snitch" whose body was wrapped up, taped, and disposed of, as Darbins's was.

The rap lyric papers were not named in the search warrant and their seizure was not within the "plain view exception" to the warrant requirement of the Fourth Amendment. Therefore, the seizure violated Stuckey's Fourth Amendment rights and it was error for the district court to deny Stuckey's motion to suppress. The next question is whether the court's error in receiving the lyrics in evidence was harmless. Chapman, 386 U.S. at 23-24.

**II.**

The government aggressively argued the incriminating nature of the rap lyrics in its closing argument, pointing out how the lyrics describe the murder of a "snitch" and the disposal of his body—all indisputably descriptive of the Darbins killing. There is no question that the government relied heavily on this evidence. But the rap lyrics on the papers seized from the backpack were not the only incriminating lyrics in evidence. The government introduced similarly incriminating rap lyrics from a publicly released CD album written and performed by Stuckey, which also contained detailed accounts of silencing informants and stuffing their bodies in the trunks of cars.

In addition to the admissible rap lyrics evidence, Steven Felder was an eyewitness to the murder and testified that he saw Stuckey shoot Darbins, and helped Stuckey dispose of Darbins's body. There is no question that Felder's credibility was suspect and Stuckey's counsel had no trouble impeaching him. But Felder's heavily self-incriminating testimony was clear, direct, and detailed, and whether Felder testified truthfully as to Darbins's murder was a matter for the jurors, not this court, to assess. United States v. Martin, 25 F.3d 293, 297 (6th Cir. 1994).

Because the rap lyrics were improperly admitted into evidence, the analysis of the harmless error test hinges on whether the jurors would have convicted Stuckey without the introduction of the seized lyrics. I think they would have, because the evidence that Stuckey killed Darbins was overwhelming, even without the rap lyrics that should have been suppressed.

While I think the district court erred in admitting the seized lyrics, I am not convinced that the error affected the outcome of Stuckey's trial, McCombs v. Meijer, Inc., 395 F.3d 346, 358 (6th Cir. 2005), and therefore, I concur in my colleagues' judgment affirming Stuckey's convictions.