*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

XAVIER FERNANDO PAYNE,

      Defendant-Appellant.

UNPUBLISHED
July 20, 2023

Nos. 358482; 358483
Washtenaw Circuit Court
LC Nos. 17-000728-FC; 18-
        001028-FC

Before: GLEICHER, C.J., and JANSEN and HOOD, JJ.

PER CURIAM.

In Docket No. 358482, defendant appeals as of right his jury trial convictions of first-degree felony murder, MCL 750.316(1)(b); conspiracy to commit armed robbery, MCL 750.529; MCL 750.157a; and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.[1]  In Docket No. 358483, defendant appeals as of right his jury trial convictions of two counts of solicitation to commit murder, MCL 750.157b(2).[2]  The trial court sentenced defendant, who was a juvenile at the time of his offenses, to 32 to 60 years' imprisonment for felony murder, 32 to 60 years' imprisonment for conspiracy to commit armed robbery, two years' imprisonment for felony-firearm, and life with the possibility of parole for each count of solicitation to commit murder.  The sentences for felony murder and conspiracy are concurrent with each other, the felony-firearm sentence is consecutive, and the solicitation sentences are concurrent with each other but consecutive to defendant's other sentences.  We affirm defendant's

---

[1] In the case on appeal in Docket No. 358482, the jury also convicted defendant of second-degree murder, MCL 750.317; however, after trial, the trial court vacated the second-degree murder conviction on double-jeopardy grounds in light of defendant's felony-murder conviction.

[2] The trial court consolidated the two cases for trial, and this Court consolidated the cases on appeal. See *People v Payne*, unpublished order of the Court of Appeals, entered September 14, 2021 (Docket Nos. 358482; 358483).

convictions but remand for resentencing of his solicitation convictions under *People v Stovall*, 510 Mich 301; 987 NW2d 85 (2022).

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

According to the evidence at trial, relevant to the convictions at issue in Docket No. 358482, defendant shot and killed 19-year-old Brandon Cross on April 2, 2017. Cross sold marijuana, and defendant texted Cross, arranging to meet him at an apartment complex under the guise of wanting to buy marijuana. In actuality, defendant and his teenaged coconspirators— Calvin Vanderhoff and Jeffrey Thurman—planned to rob Cross. Cross parked his car in a parking space at the complex, and Thurman, who was driving with Vanderhoff in the passenger seat and defendant in the backseat, parked behind Cross's vehicle. Defendant exited the car with a gun and approached Cross's car. Defendant ordered Cross to "give everything up and open the door." When Cross did not comply, defendant fired once, hitting Cross. Cross died from a gunshot wound to the chest. Relevant to the solicitation convictions at issue in Docket No. 358483, the evidence at trial established that in August or September 2018, while in jail awaiting trial for Cross's murder, defendant asked a fellow inmate—Demond Harris—to kill Vanderhoff's parents.

Vanderhoff, Thurman, and Harris all testified against defendant at trial. While in a juvenile-detention center awaiting trial, defendant wrote incriminating graffiti on his cell wall, stating, in part, that he killed someone in broad daylight on April 2, 2017. A photograph of the graffiti was admitted into evidence. At trial, defendant testified in his own defense, asserting that he participated in the events related to Cross's death under duress—specifically, he maintained that he texted Cross to arrange a meeting at Thurman's insistence while Thurman pointed a gun at him. Defendant denied shooting Cross and instead named Thurman as the gunman. Defendant also denied soliciting Harris to murder Vanderhoff's parents. The jury convicted defendant as noted. Defendant appeals as of right.

## II. NEWLY DISCOVERED EVIDENCE

On appeal, defendant first contends that he is entitled to a new trial on the basis of newly discovered evidence to support that defendant did not solicit Harris to kill Vanderhoff's parents. We disagree.

"Historically, Michigan courts have been reluctant to grant new trials on the basis of newly discovered evidence. This policy is consistent with requiring parties to use care, diligence, and vigilance in securing and presenting evidence." *People v Grissom*, 492 Mich 296, 312; 821 NW2d 50 (2012) (quotation marks and citations omitted).

> For a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial. [*People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003) (quotation marks and citations omitted).]

A defendant moving for a new trial bears the burden of satisfying each part of this test. *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012).

In this case, Harris testified that defendant asked him to kill Vanderhoff's parents. Harris testified that he received several documents from defendant in jail, including information about defendant's court dates and a note in defendant's handwriting about the case, which Harris was supposed to give to a woman named "Kelly" to help defendant establish an alibi. Harris testified that defendant gave him the document with the court dates because defendant wanted Vanderhoff's parents killed before those dates. On one of the documents, Harris handwrote an address for Vanderhoff's parents, which he testified that he received from defendant. In contrast to Harris's testimony, defendant testified that he threw the documents away, and opined that Harris must have found the papers in the trash because that was "the only place that he could have got it."

After trial, defendant moved for a new trial on the basis that another inmate—Karon Hadden—could testify that defendant gave his discovery packet to Hadden and Hadden then allowed Harris access to those documents. Hadden could also testify that he had the cell next to defendant's and he did not overhear any conversations between defendant and Harris about killing Vanderhoff's parents. To support his motion, defendant submitted an affidavit from Hadden recounting his potential testimony. The trial court denied defendant's motion.

The trial court did not abuse its discretion by denying defendant's motion for a new trial.[3] Considering the *Cress* test, for purposes of the first prong, Hadden's potential testimony that he gave Harris access to defendant's documents appears to be new evidence. Under the second prong, contrary to the prosecutor's arguments, the evidence is not cumulative. No one testified at trial— and no other evidence was presented to show—that Harris received documents from Hadden.

Nevertheless, even if defendant satisfied the first two prongs, defendant's newly discovered evidence claim fails under the third and fourth prongs of *Cress*. The third prong requires a defendant to show that he could not, using reasonable diligence, have discovered and produced the evidence at trial. See *Cress*, 468 Mich at 692. With regard to this issue, defendant claims that he had no way of knowing that Hadden gave Harris access to his documents. However, Hadden's affidavit makes clear that Hadden received the documents in question *from defendant*, meaning that defendant knew that Hadden had the documents. Accordingly, the fact that Hadden had the documents is not new evidence. See *Rao*, 491 Mich at 281 ("[E]vidence is not newly discovered if the defendant or defense counsel was aware of the evidence at the time of trial.").

Moreover, the question of where Harris obtained documents related to defendant's case has been in dispute since at least the preliminary examination in December 2018. Indeed, at the preliminary examination, defense counsel argued that inmates talk "with each other" and share

---

[3] We review a trial court's decision to deny a motion for a new trial for an abuse of discretion. *People v Johnson*, 502 Mich 541, 564; 918 NW2d 676 (2018). "An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes." *Id*. (quotation marks and citation omitted). Any findings of fact by the trial court are reviewed for clear error. *Id*. at 565. "Clear error occurs if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *Id*. (quotation marks and citation omitted).

information, and it was possible that Harris received information from someone other than defendant. Yet, knowing that he gave his discovery packet to Hadden, and knowing the potential importance of the documents at trial, defendant apparently made no effort before trial to ask Hadden whether he shared this information with Harris. "It is the obligation of the parties to undertake all reasonable efforts to marshal *all* the relevant evidence for that trial." *Id*. at 280. On the facts of this case, reasonable efforts would have involved the simple task of asking Hadden— or anyone else with whom defendant shared his discovery packet—whether they gave Harris access to this information. Cf. *People v Gray*, 216 Mich 509, 513; 185 NW 728 (1921) (rejecting newly discovered evidence claim when the new potential witness was someone whom the defendant should have questioned—she was a member of "defendant's own household, and in the nature of things, defendant would, in the exercise of any diligence, have called upon her as a witness at the trial."); *People v Safiedine*, 152 Mich App 208, 215; 394 NW2d 22 (1986) (concluding that the defendant was not entitled to a new trial when he had a potential witness's name and yet made no effort to uncover his potential testimony).[4] Likewise, with reasonable efforts, defendant could have determined that Hadden—or potentially others who lived in defendant's unit at jail—had not heard defendant and Harris discussing plans to murder Vanderhoff's parents. Because reasonable diligence would have led to the discovery and production of Hadden's potential testimony at trial, defendant's newly discovered evidence claim fails under the third prong of *Cress*, 468 Mich at 692.

Defendant's newly discovered evidence claim also fails under the fourth prong of *Cress* because Hadden's testimony would not make "a different result probable on retrial." *Id*. Considering whether new evidence would make a different result probable on retrial requires consideration of the evidence previously introduced at trial as well as the evidence that would be admitted at a new trial. *People v Johnson*, 502 Mich 541, 571; 918 NW2d 676 (2018). In this case, defendant maintains that, at trial, the question whether defendant gave documents to Harris was largely a credibility contest—Harris testified that defendant gave him those documents and defendant denied doing so. Defendant claims that Hadden's new testimony would essentially tip the scale on this point in defendant's favor. This argument ignores, however, that Harris did not simply have documents in his possession; on those documents, there also appeared a handwritten address for Vanderhoff's parents—written in *Harris's* handwriting. Hadden's claim that he gave documents to Harris does not explain how Harris would have come to learn this address if not from conversations with defendant. Moreover, although defendant argues that Hadden's testimony could change the outcome of trial by undermining *Harris's* credibility, defendant ignores that Hadden's explanation for how Harris obtained the documents is also inconsistent with *defendant's* own version of events at trial. Defendant categorically testified that "the *only* place" that Harris could have obtained the documents was the trash. Considering that defendant's new theory of how Harris obtained the documents involves a contradiction of his own previous version of events, it does not appear reasonably probable that defendant's new evidence would result in a different

---

[4] Cases by this Court decided before November 1, 1990 are not binding. MCR 7.215(J)(1). Although this Court is not "strictly required to follow uncontradicted opinions from this Court decided prior to November 1, 1990, those opinions are nonetheless considered to be precedent and entitled to significantly greater deference than are unpublished cases." *People v Bensch*, 328 Mich App 1, 7 n 6; 935 NW2d 382 (2019) (quotation marks, citation, and emphasis omitted).

verdict. Cf. *People v Payne*, 13 Mich App 116, 119; 163 NW2d 650 (1968) (concluding that a different result was not reasonably probable when the affidavits offered in support of a new trial contradicted the alibi witnesses that the defendant presented at trial).

Hadden's claim that he never heard defendant and Harris discussing a murder plot is also not reasonably likely to result in a different verdict. It seems highly improbable that Hadden overheard *every* conversation that defendant and Harris ever had while in jail. Indeed, Harris testified that, in addition to speaking to defendant near defendant's cell where Hadden now claims he could hear their conversations, defendant and Harris also spoke near *Harris's* cell, where Hadden would not have been nearby. Harris also noted that some of the people in the cells spent their time "sleeping all day." Further, Harris's handwritten note regarding an address for Vanderhoff's parents—information that seemingly must have come from defendant—supports that defendant and Harris did in fact discuss Vanderhoff's parents. Overall, considering both the old and new evidence, Hadden's testimony would not make a different verdict probable on retrial. See *Cress*, 468 Mich at 692. For these reasons, defendant failed to satisfy his burden under *Cress*, and accordingly, the trial court did not abuse its discretion by denying defendant's motion for a new trial on the basis of newly discovered evidence.

## III. SPEEDY TRIAL

Defendant next argues that he was denied his right to a speedy trial. We disagree. "The determination whether a defendant was denied a speedy trial is a mixed question of fact and law." *People v Waclawski*, 286 Mich App 634, 664; 780 NW2d 321 (2009). "The factual findings are reviewed for clear error, while the constitutional issue is a question of law subject to review de novo." *Id*.

"Both the United States Constitution and the Michigan Constitution guarantee a criminal defendant the right to a speedy trial." *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006). Determining whether a defendant has been denied the right to a speedy trial involves balancing the following four factors: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Id*. at 261-262. The time for judging whether a speedy-trial violation has occurred begins to run from the date of the defendant's arrest. *Id*. at 261. There is, however, no "fixed number of days" for determining whether a defendant has been denied a speedy trial. *Id*. Nevertheless, "a delay of eighteen months or more, as in this case, is presumed prejudicial and places a burden on the prosecutor to rebut that presumption." *People v Cain*, 238 Mich App 95, 112; 605 NW2d 28 (1999). "[A] presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *Williams*, 475 Mich at 262 (quotation marks and citation omitted). "Violation of the constitutional right to a speedy trial requires dismissal of the charge with prejudice." *Waclawski*, 286 Mich App at 664-665.

Applying these factors in this case, defendant was arrested for Cross's murder on April 5, 2017, and he was arrested for solicitation on September 18, 2018. Trial began June 21, 2021. Accordingly, the length of the delay was over 50 months for the murder case and approximately 33 months for the solicitation case. These delays were lengthy and certainly "longer than [the] routine period between arrest and trial." See *Cain*, 238 Mich App at 112. However, the length of

the delay is not dispositive, and these delays do not exceed the outer limits of delays in which this Court found that the right to a speedy trial had not been violated. See *id*. at 112-113 (compiling cases with delays of 4.5 years, 31 months, 37 months, and 19 years). Nevertheless, the delays in this case were presumptively prejudicial, triggering inquiry into the other facts to determine whether defendant was deprived of his right to a speedy trial. See *Williams*, 475 Mich at 262.

Regarding the second factor, the reasons for the delay, this factor involves a determination "whether each period of delay is attributable to the defendant or the prosecution." *Waclawski*, 286 Mich App at 666. Delays inherent in the court system, such as docket congestion, are "technically attributable to the prosecution," but "they are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *Williams*, 475 Mich at 263 (quotation marks and citation omitted). A defendant's requests for adjournments, or stipulations to delays, are attributable to defendant, and time spent litigating a defendant's motions is attributable to the defendant. See *Cain*, 238 Mich App at 113; *People v Hammond*, 84 Mich App 60, 67; 269 NW2d 488 (1978). Likewise, the withdrawal of defense counsel is a delay over which the prosecutor has no control. *People v Collins*, 388 Mich 680, 691; 202 NW2d 769 (1972). Valid reasons for a delay, such as an unavailable witness, do not weigh against either party. *Cain*, 238 Mich App at 113. Pertinent to this case, to the extent that the COVID-19 pandemic caused any delay, this is a valid reason and it does not weigh against the government. See *United States v Pair*, 522 F Supp 3d 185, 194-195 (ED Va, 2021);[5] *United States v Smith*, 494 F Supp 3d 772, 783 (ED Cal, 2020).[6]

In this case, although some of the delay is attributable to the prosecutor, a careful review of the record shows that defendant caused, or at a minimum consented to, most of the delays preceding the COVID-19 pandemic and any delay thereafter is attributable to a valid reason, namely COVID-19. Briefly summarized, defendant spent approximately 50 months in custody awaiting trial for Cross's murder and 33 months awaiting trial for solicitation. Most notably, 15 of those months (March 2020 to June 2021) are attributable to the COVID-19 pandemic, which is a valid reason for the delay. See *Pair*, 522 F Supp 3d at 194-195; *Smith*, 494 F Supp 3d at 783. Another five months (October 2019 to March 2020) are attributable to defendant's request to adjourn the proceedings pending decision in a Michigan Supreme Court case, *People v Reichard*, 505 Mich 81; 949 NW2d 64 (2020). See *Cain*, 238 Mich App at 113. Shorter delays—approximately three months—were caused by time spent deciding defendant's motion in limine, and these delays are attributable to defendant. See *id*. Additionally, defendant's first attorney withdrew in October 2018, as a result of a conflict of interest; his second attorney withdrew in April 2019, because of a breakdown in the attorney-client relationship; and his third attorney withdrew in March 2020, because of health concerns related to COVID-19. These delays related

---

[5] "Opinions of the lower federal courts and foreign jurisdictions are not binding but may be considered persuasive." *People v Patton*, 325 Mich App 425, 434 n 1; 925 NW2d 901 (2018).

[6] See also *People v Witkoski*, 341 Mich App 54, 63; 988 NW2d 790 (2022) (concluding that delay caused by COVID-19 pandemic was excusable in the context of the 180-day rule); *In re Sanborn*, 337 Mich App 252, 270; 976 NW2d 44 (2021) ("[A]ny delay between the January 2020 hearing and the May 2020 hearing can be attributed to the unprecedented COVID-19 pandemic and not to the trial court.").

to defense counsel are outside the prosecutor's control and also attributable to defendant. See *Collins*, 388 Mich at 691; *Cain*, 238 Mich App at 113. The precise reasons for other delays in this case, particularly those before COVID-19 and the *Reichard* delay, are somewhat less clear, but the record plainly shows that defendant requested—or at least agreed to—the majority of those delays, both in the district court and in the circuit court. Even if these unexplained delays are viewed as scheduling delays or a matter of docket congestion chargeable to the prosecutor, these delays have only a neutral tint and are assigned only minimal weight against the prosecutor. See *Waclawski*, 286 Mich App at 666. On balance, when the proceedings are considered as a whole, the reasons for the delays run as strongly against defendant as the prosecutor. See *Collins*, 388 Mich at 691.

The third factor, defendant's assertion of his right to a speedy trial, weighs only slightly in defendant's favor. As discussed, defendant did not object to any of the delays in this case before COVID-19, and in fact, many of those delays are attributable to him. From his conduct, it would appear that defendant was largely unconcerned about whether he received a speedy trial. See *id*. at 693. Instead, defendant waited more than three years, until June 2020—when jury trials could not be held—to assert his right to a speedy trial. At that time, every effort was made to give defendant's case priority, and his case was in fact the first jury trial heard by the trial court in 15 months. Defendant's decision to wait to assert his speedy-trial right does not weigh strongly in his favor. Cf. *Cain*, 238 Mich App at 113-114 ("[W]e cannot ignore the fact that Cain waited eighteen months to assert her right to a speedy trial and that her trial commenced within nine months of when she asserted that right.").

The last prong concerns the question of prejudice. "There are two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to the defense." *Williams*, 475 Mich at 264 (quotation marks and citation omitted). "Prejudice to the defense is the more serious concern, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id*. (quotation marks and citation omitted). In this case, defendant makes the general assertion that witnesses or evidence may have been lost, or that the passage of time may have impacted witnesses' memories. Defendant fails, however, to point to anything to support that a potential witness was lost, that other exculpatory evidence was misplaced, or that any memories favorable to the defense had faded. See *Waclawski*, 286 Mich App at 669. In other words, defendant's ability to defend against the case was not prejudiced by the delay. See *Williams*, 475 Mich at 264.

Defendant also asserts personal prejudice, stating that he suffered from stress, loss of contact with family and friends, loss of unspecified work opportunities, and limitations on everyday life. Every incarceration, including defendant's incarceration, "results in a degree of prejudice to the person." See *Collins*, 388 Mich at 694. In short, under the prejudice prong, "defendant suffered considerable personal deprivation by long incarceration, but it cannot be said that his ability to defend himself was in any significant way prejudiced." *People v Chism*, 390 Mich 104, 115; 211 NW2d 193 (1973) (involving 27 months' incarceration).

On the whole, balancing the factors relevant to a speedy-trial determination, although the delay was a long one, the record shows that most of the delay was not attributable to the prosecutor and that defendant waited more than three years to assert his speedy-trial right.

Further, although defendant suffered some degree of personal hardship as a result of being incarcerated while awaiting trial, "the most important thing is that there is no evidence that a fair trial was jeopardized by delay." *Id*. When considering the impact of this personal prejudice to defendant, it should also be noted, particularly in a case in which defendant contributed to much of the delay and in which much of the delay was beyond anyone's control, that defendant was "not a bailable subject."[7] See *id*. 115-116 ("The necessarily protracted litigation and defendant's non-bailable condition account for the length of his presentence incarceration."). Although not discounting the personal hardship of incarceration, when balanced with the other factors in this case, including defendant's delay in asserting his speedy-trial right and the valid reasons for delay, defendant was not denied his right to a speedy trial, and he is not entitled to dismissal of the charges.[8] See *Williams*, 475 Mich at 265; *Chism*, 390 Mich at 115-116.

## IV. GRAFFITI EVIDENCE

Next, defendant argues that the trial court abused its discretion by admitting the graffiti evidence on his cell wall as an admission by a party-opponent. Defendant contends that the graffiti is not truly an admission by defendant that he killed Cross. Rather, defendant asserts that the graffiti constitutes artistic expression—similar to lyrics—that merely expressed defendant's feelings of guilt about the role he unwillingly played in contributing to Cross's death. Defendant broadly argues that artistic expression, when used as an admission of guilt, is unreliable and its probative value is substantially outweighed by the danger of unfair prejudice. This argument lacks merit.

This Court reviews a trial court's evidentiary decisions for an abuse of discretion. *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011). "An abuse of discretion occurs when the trial court reaches a result that is outside the range of principled outcomes." *Id*. Any preliminary questions of law, including the interpretation of the rules of evidence, are reviewed de novo. *Id*.

As an initial matter, we note that the written graffiti statement constitutes an admission by defendant, see MRE 801(d)(2), meaning that its admission is not barred by the hearsay rule. See *People v Goddard*, 429 Mich 505, 518 n 14; 418 NW2d 881 (1988); *People v Brown*, 120 Mich App 765, 782; 328 NW2d 380 (1982) ("[A]ny out-of-court statement made by a defendant which

---

[7] Indeed, in view of the long delay in this case, the trial court held two evidentiary hearings to consider the possibility of bond, but found, by clear and convincing evidence, that defendant could not be released because he posed a danger to the community. See MCR 6.004(C). Defendant does not challenge this ruling on appeal.

[8] On appeal, both parties make cursory references to the 180-day rule. "The 180-day rule is distinct from a criminal defendant's constitutional right to a speedy trial under our federal and state Constitutions . . . ." *Witkoski*, 341 Mich App at 60. Any claim under the 180-day rule has not been preserved or adequately briefed, and in any event, it would clearly lack merit as the rule does not require trial to begin with 180 days; instead, it requires only that the prosecutor "take good-faith steps to commence action within 180 days," *People v Lown*, 488 Mich 242, 256-257, 266; 794 NW2d 9 (2011), which clearly occurred in this case.

is offered against that defendant is an admission."). However, this conclusion only disposes of any potential hearsay objection. The question remains whether the graffiti is relevant, see MRE 401, and if so, whether its probative value is substantially outweighed by the danger of unfair prejudice, see MRE 403.

> Generally, all relevant evidence is admissible at trial. Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence. Under this broad definition, evidence is admissible if it is helpful in throwing light on any material point. However, even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence. [*People v Aldrich*, 246 Mich App 101, 114; 631 NW2d 67 (2001) (citations omitted).]

Relevant to defendant's artistic-expression argument, there is no broad rule that artistic expression is unreliable and, therefore, irrelevant. Instead, when considering the relevance of a statement—be it artistic or otherwise—the question is whether, in light of the circumstances surrounding the making of the statement, it is relevant and probative for the purpose for which it is offered. See *Goddard*, 429 Mich at 519-520. For example, in *Goddard*, the defendant was on trial for felony murder. *Id*. at 508. At trial, the prosecutor offered evidence that, six months before the killing, while robbing another house, the defendant said that if he and his accomplice " 'were ever approached that he'd fire once into the air and then fire at the people.' " *Id*. The trial court admitted this statement at trial to show defendant's malice and intent. *Id*. at 514. On appeal, in concluding that the probative value of this statement was "low" and the potential prejudice outweighed the statement's probative value, the Court emphasized that (1) the statement was made six months before the murder in question, (2) at the time the statement was made "it was completely hypothetical," (3) the statement appeared to "be an exercise in machismo, one accomplice bragging to another about how tough he would be," and (4) the statement did not coincide with what ultimately occurred in the murder for which the defendant was on trial—that is, the defendant did not fire a warning shot into the air and his codefendant claimed that the rifle discharged accidentally. *Id*. at 519-520. Given this minimal probative value, the Court concluded that the danger of prejudice outweighed the evidence's probative value. *Id*. at 521.

Although *Goddard* did not involve an artistic statement, courts have engaged in similar analysis when determining the relevance and admissibility of artistic statements—such as lyrics— considering, for example, when the statement was made in relation to the crime and whether it appeared to be a general, machismo-type statement or to specifically describe the offense for which the defendant was on trial. See, e.g., *United States v Stuckey*, 253 Fed Appx 468, 482 (CA 6, 2007); *United States v Wilson*, 493 F Supp 2d 460, 462-463 (EDNY, 2006). See also *United States v Sims*, 11 F4th 315, 323-324 (CA 5, 2021). In this context, the purpose for which the statement is being offered is also relevant. See *Stuckey*, 253 Fed Appx at 483. As one court summarized, "expressive forms of evidence may be admissible [when] such writing reveals a strong nexus between the specific details of the artistic composition and the circumstances of the underlying offense for which a person is charged, and the probative value of that evidence outweighs its apparent prejudicial impact." *United States v Graham*, 293 F Supp 3d 732, 740 (ED Mich, 2017)

(quotation marks and citation omitted). In contrast, violent fictional writings or general statements about violence or guns in, for example, lyrics, may not be admissible. See *Stuckey*, 253 Fed Appx at 483; see also *People v Bennett*, 505 Mich 961; 937 NW2d 119 (2020).

In this case, the prosecutor introduced the graffiti written by defendant on the wall of his juvenile-detention cell as evidence that defendant killed Cross. As set forth in the trial transcript, the graffiti written by defendant stated: "Caught a body April 2, 2017, killed a N***a," "in broad daylight, I was only sixteen, now I'm facing life. The last time I was in Court I heard the Judge say life. When I was in Court the last thing I saw was my mama on her knees again," asking "God why." As written, these are not general statements about violence or expressions of machismo. To the contrary, defendant's graffiti could not have been more specific. See *Stuckey*, 253 Fed Appx at 483. Defendant plainly admitted to killing someone on April 2, 2017, in broad daylight, details which accord with the facts of Cross's murder. Given the nexus between the details in the graffiti and the crime for which defendant was on trial, this evidence was relevant and probative. See *id.*; *Graham*, 293 F Supp 3d at 740. Indeed, as essentially a written confession, the graffiti is relevant and *highly* probative. See *People v Pipes*, 475 Mich 267, 281; 715 NW2d 290 (2006) ("[T]he defendant's *own* confession is probably the most probative and damaging evidence that can be admitted against him.") (quotation marks and citation omitted).

Moreover, the trial court did not abuse its discretion by concluding that the probative value of defendant's statement—which was highly relevant—was not outweighed by the danger of unfair prejudice. Unfair prejudice is not established simply because the evidence is damaging to defendant's position; all relevant evidence is damaging to some extent. *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995). "The danger the rule seeks to avoid is that of unfair prejudice, not prejudice that stems only from the abhorrent nature of the crime itself." *People v Starr*, 457 Mich 490, 500; 577 NW2d 673 (1998). Defendant's admission to an abhorrent crime is prejudicial because of the underlying characteristics of the crime to which defendant admitted, but MRE 403 does not require exclusion of such evidence.[9] See *id*. Further, to the extent that defendant contends that his graffiti was not a confession but an expression of remorse for his unwilling role, defendant had the opportunity to testify and to explain his position at trial. The question of what weight to give the graffiti and defendant's testimony were questions for the jury. See *People v Herndon*, 246 Mich App 371, 408-409; 633 NW2d 376 (2001). On the whole, the probative value of the graffiti was not outweighed by the danger of unfair prejudice. See *Mills*, 450 Mich at 75. The trial court did not abuse its discretion by admitting the graffiti into evidence.

## V. OTHER-ACTS EVIDENCE

Next, defendant argues that the trial court erred by allowing the prosecutor to present other-acts testimony from Vanderhoff to the effect that he and defendant sometimes did illegal things together, such as smoking marijuana, and that at one point they were "kind of involved in like a stolen car." Defendant contends that this evidence constituted impermissible propensity evidence

---

[9] We note that the graffiti also contained offensive language, but defendant does not argue that this language rendered the statement unfairly prejudicial, nor would it given the profane language that appeared in the evidence throughout this case.

that was more prejudicial than probative and that the prosecutor failed to provide the notice required by MRE 404(b)(2) to use other-acts evidence.

The prosecutor concedes—and we agree—that there was no proper purpose for the introduction of evidence that defendant engaged in prior illegal acts with Vanderhoff, including smoking marijuana and some unspecified involvement with a stolen car. In other words, this evidence had no relevance to "proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident." MRE 404(b)(1). The evidence is also prejudicial as it generally reflects defendant's bad character or criminal propensity. See *People v Jackson*, 498 Mich 246, 259; 869 NW2d 253 (2015). In short, Vanderhoff's testimony about his previous illegal activities with defendant was not admissible.[10]

With that said, the issue is unpreserved, and it is clear that any error in the admission of this evidence does not warrant relief on appeal. See *People v Coy*, 258 Mich App 1, 12; 669 NW2d 831 (2003).[11] The testimony in question was brief. To the extent that Vanderhoff noted that he and defendant smoked marijuana together, that fact was unremarkable in the context of a case in which, by defendant's own admission, he was willing to facilitate what was then the illegal purchase of marijuana for Thurman and Vanderhoff. Considered in the context of the severity of the charges in this case, there was little likelihood that the jury was going to conclude that a teenager who smoked marijuana with his friend and had some unspecified involvement with a "stolen car" shot a man to death and then solicited an inmate to murder his friend's parents. Cf. *People v Ortiz*, 249 Mich App 297, 306-307; 642 NW2d 417 (2001) (finding minimal danger that a jury would conclude that, because the defendant had "improperly grabbed two women, he must have killed his ex-wife"). Further, as compared to the brief other-acts evidence, there was substantial evidence of defendant's guilt. He admitted to sending the text messages that lured Cross to his death, though defendant claimed to have sent these texts under duress. Vanderhoff and Thurman identified defendant as the shooter. And defendant confirmed that he killed Cross in the graffiti that he wrote on his cell wall, in which he stated that he "caught a body" and "killed" someone on April 2, 2017, the date of Cross's death. Consequently, although the admission of Vanderhoff's testimony of prior illegal activity was error, defendant has not established that this error affected the outcome of proceedings, and he is not entitled to relief on appeal.[12] See *Coy*, 258 Mich App at 12.

---

[10] The prosecution also concedes that it failed to provide the proper notice required by MRE 404(b)(2).

[11] Unpreserved claims of evidentiary error are reviewed for plain error affecting substantial rights. *Coy*, 258 Mich App at 12. "First, there must be an error; second, the error must be plain (i.e., clear or obvious); and third, the error must affect substantial rights (i.e., there must be a showing that the error was outcome determinative)." *Id.* "[R]eversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings, independent of guilt or innocence." *Id.*

[12] On appeal, defendant also argues that defense counsel provided ineffective assistance by failing to object to the other-acts evidence. This argument lacks merit. Decisions whether to object to

## VI. REBUTTAL ARGUMENT INVOLVING PREARREST SILENCE

Defendant next argues that the prosecutor engaged in misconduct by commenting on defendant's prearrest silence during rebuttal argument. Defendant's claim is unpreserved because he failed to contemporaneously object and request a curative instruction. See *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010).[13] In the alternative, defendant argues that defense counsel provided ineffective assistance by failing to object to the prosecutor's allegedly improper argument. These arguments lack merit.

"A prosecutor has committed misconduct if the prosecutor abandoned his or her responsibility to seek justice and, in doing so, denied the defendant a fair and impartial trial." *People v Lane*, 308 Mich App 38, 62; 862 NW2d 446 (2014). "Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial. They are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008) (citations omitted). A prosecutor's remarks must be considered in context, in light of defense counsel's comments, and "[a]n otherwise improper remark may not rise to an error requiring reversal when the prosecutor is responding to the defense counsel's argument." *People v Watson*, 245 Mich App 572, 593; 629 NW2d 411 (2001) (quotation marks and citation omitted).

In this case, defendant argues on appeal that the prosecutor impermissibly commented on his prearrest silence during rebuttal; defendant maintains that his prearrest silence was not relevant because it would not have been natural for him to speak to police given his fear of Thurman and the fact that he was a young, Black man who distrusted the police. Relevant to defendant's arguments, as an evidentiary matter,[14] "nonverbal conduct by a defendant, a failure to come forward, is relevant and probative for impeachment purposes when the court determines that it

---

the admission of evidence are presumed to be a matter of trial strategy, see *People v Johnson*, 315 Mich App 163, 190; 889 NW2d 513 (2016), and defendant has not overcome this presumption. Defense counsel could reasonably have refrained from objecting and requesting a curative instruction to avoid drawing attention to the other-acts testimony in question. See *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008); *People v Rice (On Remand)*, 235 Mich App 429, 444-445; 597 NW2d 843 (1999). Further, given the strong evidence of defendant's guilt, defendant has not shown that, but for counsel's failure to object to this evidence, there was a reasonable probability of a different outcome. See *People v Trakhtenberg*, 493 Mich 38, 55-56; 826 NW2d 136 (2012).

[13] Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting a defendant's substantial rights. *People v McLaughlin*, 258 Mich App 635, 645; 672 NW2d 860 (2003).

[14] Although challenging the relevancy of his prearrest silence as an evidentiary matter, defendant concedes on appeal that the use of prearrest silence does not pose a constitutional problem. See *People v McGhee*, 268 Mich App 600, 634; 709 NW2d 595 (2005) ("A defendant's constitutional right to remain silent is not violated by the prosecutor's comment on his silence before custodial interrogation and before *Miranda* warnings have been given."). See also *People v Hackett*, 460 Mich 202, 214; 596 NW2d 107 (1999) ("The issue of prearrest silence is one of relevance.").

would have been 'natural' for the person to have come forward with the exculpatory information under the circumstances." *People v Cetlinski*, 435 Mich 742, 760; 460 NW2d 534 (1990). It is not considered natural for someone to come forward to speak to police when doing so would necessitate implicating themselves in a crime, and in these circumstances, this failure to implicate oneself cannot be used as evidence at trial. *People v Dye*, 431 Mich 58, 80-81; 427 NW2d 501 (1988).

In contrast, it is, for example, considered natural that someone claiming to be "the victim of an armed robbery rather than a perpetrator of an assault" would come forward to report the crime to the police. *People v Collier*, 426 Mich 23, 34; 393 NW2d 346 (1986). Likewise, this Court has also concluded that it would be "natural" for someone claiming to have committed a crime under duress to contact the police, even if that person claimed that there were other reasons, such as fear, for his or her silence. See *People v Gibbs*, 299 Mich App 473, 484; 830 NW2d 821 (2013). Aside from failing to contact the police, it might also be argued that it would be natural for a defendant to report the matter to someone other than the police—such as a parent. See *id*. (involving a defendant who also failed to report the crime to his mother).

The defense theory of this case was that defendant acted under duress. Defendant testified that his role was limited to sending the text messages to arrange to meet Cross at the Glencoe Hills apartments, and he maintained that Thurman forced him to send these messages at gunpoint. On direct examination, *defendant* raised the issue of his prearrest silence by testifying that he went home after the shooting, hugged his mother, and then sat in his room on "auto pilot," staring "straight ahead" with a feeling of unreality about what just happened. He also testified that he did not tell his mother or attempt to contact the police because he was scared of Thurman given that Thurman shot someone.

In arguing this duress theory during closing arguments, defense counsel specifically asserted that this was not a defense "concocted after the fact," rather, this was defendant's explanation "from the very beginning," and defense counsel contrasted defendant's behavior following the shooting with that of Thurman and Vanderhoff to support that defendant was not the shooter. In response to defense counsel's arguments, including those related to Vanderhoff's and Thurman's behavior after the shooting and his contention that defendant raised duress as a defense from the "very beginning," during rebuttal, the prosecutor argued:

> [Thurman and Vanderhoff] didn't know [Cross] was dead and that was very clear that night after, after they dropped [defendant] off.

> After [defendant] went home, talked to his mom, told her what happened, called the police, explained what had happened—oh he didn't do any of that. No, he didn't do a single thing. He didn't do a single thing to help out the victim because it's not true.

> Again, the defense expects you to believe that Jeff Thurman commits a murder and shoots a guy and then flaunts the gun, the murder weapon. He's going to film himself with the murder weapon after he shot and killed someone. That makes a lot less sense than the fact that Jeff had no idea the guy was dead.

-13-

[Defendant] knew what the condition of Brandon Cross was, he knew he hit him.

The prosecutor's argument was not improper. As an initial matter, given that *defendant* offered the evidence of his prearrest silence on direct examination, any claim that it was irrelevant and inadmissible is waived. See *People v Riley*, 465 Mich 442, 448-449; 636 NW2d 514 (2001). The only question is whether the prosecutor improperly commented on this evidence. Considering that *defendant* introduced the evidence of his prearrest silence about which he now complains, and in light of defense counsel's closing arguments, the prosecutor's rebuttal argument was a fair response to defendant's contentions (1) that he had, from the *very beginning*, claimed that he acted under duress; and (2) that Thurman's and Vanderhoff's behavior after the shooting—when compared to defendant's behavior—supported defendant's account of events. See *Watson*, 245 Mich App at 593. It was, in other words, reasonable for the prosecutor to impeach defendant's credibility by arguing that, if defendant's claim that he acted under duress were true, he would have informed his mother or the police or both about the shooting after he returned home. Cf. *Gibbs*, 299 Mich App at 484 (finding no error in a prosecutor's argument that, if the defendant participated in a robbery under duress, he would have alerted his mother or law enforcement). The prosecutor was allowed to argue his theory of the case as supported by the evidence, see *Unger*, 278 Mich App at 236, and there was nothing improper in the prosecutor's remarks in this regard. It also follows that defense counsel did not provide ineffective assistance by failing to raise a futile objection.[15] See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## VII. PHOTOS AND EVIDENCE ABOUT CROSS'S BACKGROUND

Defendant argues that the trial court abused its discretion by allowing the prosecutor to introduce four photos depicting Cross while he was alive, including photographs of Cross with his daughter. Defendant contends that the photos—and testimony from Cross's mother about Cross's background—were irrelevant and unfairly prejudicial because they garnered sympathy for the victim. Defendant failed to object in the trial court, meaning his arguments are, at best,

---

[15] Defendant also briefly asserts that, in light of the prosecutor's argument, the trial court should have given the jury an instruction to the effect that his prearrest silence could only be used for impeachment purposes. Defendant failed to request such an instruction, and he is not entitled to relief on the basis that the trial court failed to sua sponte provide such as instruction. See MCL 768.29 ("The failure of the court to instruct on any point of law shall not be ground for setting aside the verdict of the jury unless such instruction is requested by the accused."). To the extent that defendant challenges counsel's effectiveness related to his prearrest silence, the decision whether to request an instruction is a matter of trial strategy, and defense counsel may have reasonably refrained from requesting such an instruction to avoid drawing further attention to defendant's prearrest silence. See *Rice (On Remand)*, 235 Mich App at 444-445.

unpreserved.[16]  See *Coy*, 258 Mich App at 12.  In the alternative, defendant argues that defense counsel provided ineffective assistance by failing to object.

Photographic evidence, like other evidence, "is generally admissible as long as it is relevant, MRE 401, and not unduly prejudicial, MRE 403."  *People v Gayheart*, 285 Mich App 202, 227; 776 NW2d 330 (2009).  "Generally, photographs that are merely calculated to arouse the sympathies or prejudices of the jury should not be admitted."  *People v Howard*, 226 Mich App 528, 549; 575 NW2d 16 (1997).  Potentially, a photo of "a victim taken prior to being killed is relevant to proving the defendant killed a live human being and relevant to proving the identity of the victim, whether or not disputed at trial, because the state always has the burden of proving every element of the offense."  23A CJS, Criminal Procedure and Rights of Accused, § 1467.  Courts should, however, exercise caution when admitting a photo of a victim while alive because there is a "risk that the photograph will merely generate sympathy for the victim."  *Id*.  To minimize the potential for sympathy, it is considered better to "proffer a photograph of the victim alone" rather than with family members or others.  *Id*.  "The proper inquiry is always whether the probative value of the photographs is substantially outweighed by unfair prejudice."  *Mills*, 450 Mich at 76.

In this case, Cross's mother testified that Cross was 19 years old at the time of his death.  She described him as "charismatic," athletic, and "very funny."  He was also a new father, with a one-year-old daughter.  He was a musician and a rap artist.  According to his mother's testimony, to support his family, Cross worked at a warehouse.  He also sold "some weed on the side."  The prosecutor introduced four pictures of Cross taken at about the time that he died; the photos showed him with his daughter and at work.

Some of this testimony—particularly the fact that Cross sold marijuana—was relevant and admissible to provide context in a case in which defendant killed Cross after arranging to meet him to purchase marijuana.  To a limited extent, in this murder prosecution, testimony about Cross and the photos of him had some minimal relevancy in establishing that defendant killed a live human being.  23A CJS, Criminal Procedure and Rights of Accused, § 1467.  See also *People v Goecke*, 457 Mich 442, 463; 579 NW2d 868 (1998) ("Murder is a common-law offense, defined as the unlawful killing of one human being by another with malice aforethought.").  However, even assuming some minimal relevance to establishing that Cross was a live human being, the fact remains that much of his mother's testimony was simply irrelevant.  Whether Cross was a father or a musician or held a job, and any of his other personal characteristics did not—on the facts of this case—make it more probable that defendant killed him. See MRE 401. Further, the admission of such evidence, particularly when coupled with several photos of Cross with his daughter, potentially served to garner sympathy for Cross, thereby unfairly prejudicing defendant. See MRE 403; 23A CJS, Criminal Procedure and Rights of Accused, § 1467.

---

[16] With regard to the photos, we note that counsel did not simply fail to object.  Counsel waived the issue by affirmatively responding "[n]o objection" when the prosecutor moved to admit the photos. See *People v McDonald*, 293 Mich App 292, 295; 811 NW2d 507 (2011).  Nevertheless, we consider this issue to resolve defendant's ineffective-assistance claim.

Nevertheless, defendant cannot show plain error because the admission of this evidence was not outcome-determinative, see *Coy*, 258 Mich App at 12, and even assuming arguendo that defense counsel acted unreasonably by waiving any objection to the admission of the photos or failing to object to testimony from Cross's mother, defendant is not entitled to relief on ineffective-assistance grounds because it does not appear that, but for this error, a different result would have been reasonably probable, see *People v Trakhtenberg*, 493 Mich 38, 55-56; 826 NW2d 136 (2012). The testimony of Cross's mother and the admission of the photos were, overall, relatively brief. Further, although defendant did not object or a request curative instruction, the trial court instructed the jurors that they "must not let sympathy or prejudice influence" their decision. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Further, the evidence against defendant was substantial. Defendant admitted to texting Cross to lure him to the meeting place. Vanderhoff and Thurman identified defendant as the shooter. And defendant admitted to the killing in his graffiti, stating that he "caught a body" and "killed" someone on April 2, 2017, the date of Cross's death. Considering the evidence as a whole, even assuming that testimony about Cross's background and the photos were inadmissible, at least in part, defendant has not shown the prejudice necessary to establish plain error or ineffective assistance. See *Trakhtenberg*, 493 Mich at 55-56; *Coy*, 258 Mich App at 12. Defendant is not entitled to relief.

## VII. OFFENSE VARIABLE 4

Defendant asserts that the trial court erred by assigning 10 points for offense variable (OV) 4 in connection with his solicitation convictions because there is no evidence that Vanderhoff's parents suffered psychological injury. We disagree.

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*.

OV 4 addresses a victim's psychological injury. MCL 777.34(1). Under MCL 777.34(1)(a), OV 4 is assigned 10 points when "[s]erious psychological injury requiring professional treatment occurred to a victim." When determining whether "serious psychological injury may require professional treatment," "the fact that treatment has not been sought is not conclusive." MCL 777.34(2). A trial court may, for example, assign points for OV 4 "if the victim suffers, among other possible psychological effects, personality changes, anger, fright, or feelings of being hurt, unsafe, or violated." *People v Lampe*, 327 Mich App 104, 114; 933 NW2d 314 (2019) (quotation marks and citation omitted). The scoring of OV 4 may not, however, "be based on the assumption that people *typically* suffer psychological injury when they are victims of the type of crime in question; and while relevant, a victim's fear *during* the crime does not by itself justify the scoring of OV 4." *Id*.

In this case, the trial court relied on a victim-impact statement from Vanderhoff's parents to support the scoring of OV 4, and this statement amply supported the assignment of 10 points. Vanderhoff's mother described panic attacks arising from "the continual strain," and his father, who suffers from post-traumatic stress disorder (PTSD), experienced an exacerbation of his PTSD

-16-

symptoms as a result of defendant's actions. They both described feeling as though they lived under a "constant threat" for their lives, and they felt fear during commonplace events like having headlights drive down their driveway. They described fear, stress, feelings of helpless, and worry that someone was "coming to harm" them. And these feelings were not short-lived. In fact, their ongoing fear prompted them to sell their "beautiful home," where they had lived for more than 20 years, and to move to a "remote area in order to feel safe." Yet, even after moving, the fear caused by being defendant's targets is "never far from" their minds. These prolonged feelings of fright and being unsafe support the trial court's conclusion that Vanderhoff's parents suffered serious psychological injury requiring profession treatment. See *id*. Accordingly, the trial court did not err by assessing 10 points for OV 4. See MCL 777.34(1)(a).

The only irregularity in the scoring of OV 4 in this case is the fact that the prosecutor presented this victim-impact statement from Vanderhoff's parents after sentencing in response to defendant's motion for resentencing in which he asserted for the first time that OV 4 had been improperly scored. However, if the existing record at sentencing provided an insufficient basis on which to determine an appropriate score for OV 4, the trial court had the discretion to consider additional proofs when considering defendant's challenge to OV 4. See *People v Ratkov (After Remand)*, 201 Mich App 123, 125-126; 505 NW2d 886 (1993) ("If the record provides insufficient evidence upon which to base the decision supporting or opposing the scoring, the court in its discretion may order the presentment of further proofs."). Further, we note that defendant acknowledged receipt of this statement before the trial court ruled on the scoring of OV 4 and made no request to present his own proofs on this issue.[17] There was no error in the trial court's consideration of this late-submitted victim-impact statement. See *id*. And, in light of this statement, the trial court did not err by assigning 10 points for OV 4.

## IX. CRUEL OR UNUSUAL PUNISHMENT

Lastly, defendant contends that his sentence of life with the possibility of parole for solicitation to commit murder constitutes cruel or unusual punishment because defendant was a juvenile when he committed the offenses.[18] Adhering to the reasoning in the Michigan Supreme Court's decision in *Stovall*, we agree, and remand for resentencing.

In *Miller v Alabama*, 567 US 460, 465; 132 S Ct 2455; 183 L Ed 2d 407 (2012), the United States Supreme Court held "that mandatory life without parole [LWOP] for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " The Supreme Court did not categorically ban LWOP sentences for juveniles;

---

[17] On appeal, with regard to OV 4 and several of his other arguments, defendant requests that we remand for further factual development. Defendant has failed, however, to show a need for an evidentiary hearing related to any of his claims. His request to remand for an evidentiary hearing is therefore denied. See MCR 7.211(C)(1).

[18] Defendant filed to raise his claim that a parolable life sentence for solicitation is unconstitutional in the trial court; thus, this issue is not preserved. *People v Bowling*, 299 Mich App 552, 557; 830 NW2d 800 (2013). Review of an unpreserved constitutional claim, including a cruel-or-unusual-punishment claim, is limited to plain error affecting substantial rights. *Id*.

nevertheless, the Court anticipated that "this harshest possible penalty will be uncommon." *People v Taylor*, 510 Mich 112, 127; 987 NW2d 132 (2022) (quotation marks and citation omitted). Following *Miller*, the Legislature enacted statutes, MCL 769.25 and MCL 769.25a, to remedy the constitutional defect in Michigan's sentencing scheme that mandated LWOP for juvenile offenders convicted of certain offenses. Under this new scheme, the default sentence for a juvenile offender convicted of certain offenses in Michigan, including first-degree murder, is a term of years—a minimum of not less 25 years and not more than 40 years and a maximum sentence of not less than 60 years. MCL 769.25(9). LWOP is still a possibility, but such a sentence requires a prosecutor to move for a LWOP sentence, and there are certain procedural standards that must be met, including a requirement that the prosecutor rebut, by clear and convincing evidence, a presumption that a LWOP sentence is disproportionate. *Taylor*, 510 Mich at 135.

Against this backdrop restricting the imposition of LWOP as a sentence for juveniles, in *Stovall*, 510 Mich at 313, the Michigan Supreme Court recently considered whether a *parolable* life sentence constituted cruel or unusual punishment, under Const 1963, art 1, § 16, for a juvenile convicted of second-degree murder.[19] To analyze this question, the Court applied a four-part test from *People v Bullock*, 440 Mich 15; 485 NW2d 866 (1992).

> That test assesses (1) the severity of the sentence imposed compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed on other offenders in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the penological goal of rehabilitation. [*Stovall*, 510 Mich at 314.]

Applying this test, the Court ultimately held that "a parolable life sentence for a defendant who commits second-degree murder while a juvenile violates" Const 1963, art 1, § 16. *Id*. at 314-322.

The current case differs from *Stovall* insofar as *Stovall* involved a second-degree murder conviction whereas defendant was sentenced to life with the possibility of parole for solicitation to commit murder. In our view, this distinction does not compel a different result. That is, analogizing to *Stovall*'s application of the *Bullock* factors, under the first and second *Bullock* factors, as with second-degree murder, a parolable life sentence is the most severe penalty that can be imposed for solicitation to commit murder. See MCL 750.157b(2). "And it is particularly severe when imposed on a juvenile, given the important mitigating ways that children are different from adults." *Stovall*, 510 Mich at 314-315. The severity of the sentence is also heightened by the lack of procedural safeguards, available to those who commit first-degree murder under *Miller*, but which do not apply to those convicted of other, less serious offenses. See *id*. at 315-316. The "practical" realities of sentencing and parole that may make a parolable life sentence "*more* severe

---

[19] The Michigan Supreme Court also briefly addressed whether a parolable life sentence constituted cruel and unusual punishment under the Eighth Amendment, and the Court concluded that such a sentence did not violate the United States Constitution. *Stovall*, 510 Mich at 313.

than the minimum sentences now given to most juveniles who commit *first*-degree murder: 25 to 40 year," also apply to a parolable life sentence for solicitation. See *id*. at 316-318.

Regarding the third *Bullock* factor, as with second-degree murder, the trend toward treating juveniles less harshly than adults likewise favors treating juveniles convicted of solicitation less harshly than adults.[20] See *id*.

Finally, under the fourth *Bullock* factor, "although a parolable life sentence may advance the penological goal of rehabilitation in theory, for juvenile offenders the question is whether that parolable life sentence provides a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id*. at 320 (quotation marks and citation omitted). All the concerns cited in *Stovall* regarding rehabilitation and the opportunity for release for juveniles convicted of second-degree murder—including (1) the low priority given those serving parolable life sentences, in terms of education and rehabilitation programming; (2) the need for a meaningful opportunity for release as compared to those serving first-degree murder convictions; and (3) the vagaries of the Parole Board—apply equally to those convicted of solicitation to commit murder. *Id*. at 321-322. Overall, we can conceive of no sound basis for treating a parolable life sentence for solicitation to commit murder differently than the parolable life sentence for second-degree murder at issue in *Stovall*.

In contrast, in attempting to distinguish *Stovall* from the current case, the prosecutor makes two main arguments. First, the prosecutor argues that solicitation to commit murder is a more egregious crime because it involves planning and deliberation that is not required for second-degree murder. See *People v Fyda*, 288 Mich App 446, 455 & n 25; 793 NW2d 712 (2010) (recognizing that solicitation of murder requires the intent to kill and "shares the elements of premeditation and deliberation with first-degree murder") (quotation marks and citation omitted). There are at least two significant flaws with this argument.

First, it is debatable whether second-degree murder or solicitation is necessarily the more egregious crime. Although solicitation does involve premeditation and deliberation, it is also an inchoate offense that "punishes the actual advance planning and the acts taken in preparation for committing the substantive criminal acts and not the carrying out of the planned criminal acts." *Id*. at 455 n 25 (quotation marks and citation omitted); see also *People v Vandelinder*, 192 Mich App 447, 454-455; 481 NW2d 787 (1992). In contrast, with second-degree murder, someone is

---

[20] Under this *Bullock* factor, *Stovall* also considered how other states sentence individuals convicted of second-degree murder, noting that many states allow term-of-years sentences—rather than parolable life sentences—for *anyone* convicted of second-degree murder. *Stovall*, 510 Mich at 319-320. A comparison to some of the sentences available in other states shows that many punish solicitation with a term-of-years sentence rather than parolable life. See, e.g., Cal Penal Code 653f; Ga Code Ann 16-4-7(b); Haw Rev Stat Ann 705-512; Haw Rev Stat Ann 706-659; Idaho Code Ann 18-306; 720 Ill Comp Stat Ann 5/8-1; Kan Stat Ann 21-5303(d)(1); Me Rev Stat 17-A, § 153; Me Rev Stat 17-A, § 1604; NH Rev Stat Ann 629:2(IV); Or Rev Stat Ann 161.435; Or Rev Stat Ann 161.605; SD Codified Laws 22-4A-1(1); SD Codified Laws 22-6-1. However, among other states, some, like Michigan, allow a term-of-years or a life sentence. See, e.g., Okla Stat Ann § 701.16.

actually killed, and they are killed with malice and without justification or excuse. See *Goecke*, 457 Mich at 463. Further, the Legislature has chosen to impose the same maximum sentence for second-degree murder and solicitation to commit murder. Compare MCL 750.157b(2), with MCL 750.317. In fact, second-degree murder is in a higher crime class (M2), see MCL 777.16p, than solicitation to commit murder, which is a Class A offense, see MCL 777.16h. These sentencing decisions by the Legislature suggest that solicitation is not considered a more heinous crime than second-degree murder.

Secondly, and perhaps more importantly, the critical point under *Stovall* is not whether an offense is more or less heinous than second-degree murder. To the extent that *Stovall* involved a comparison of the heinousness of offenses and the available sentences, the pertinent point of comparison was *first-degree murder*, which is subject to punishment by a presumptive term-of-years sentence for juveniles. See *Stovall*, 510 Mich at 314-322. Solicitation is an extremely serious offense, but it is still an offense that—like second-degree murder—is exceeded by first-degree murder. Accord *People v Fernandez*, 427 Mich 321, 336; 398 NW2d 311 (1986) ("Conspiracy to commit first-degree murder is an extremely serious offense, perhaps exceeded only by first-degree murder itself."). In short, we find no merit in the prosecutor's attempt to distinguish *Stovall* on the basis that solicitation to commit murder is more egregious than second-degree murder.

The prosecutor also argues that *Stovall* should not apply in this case because, as applied to defendant in particular, a parolable life sentence is not cruel or unusual. The prosecutor's attempt to validate the constitutionality of a parolable life sentence for solicitation to commit murder based on the specific facts of this case lacks merit. The *Miller* line of cases relates to juveniles (or, in Michigan, 18-year-old offenders) as a class, many of whom have committed heinous crimes. See *People v Parks*, 510 Mich 225, 266; 987 NW2d 161 (2022) ("[W]e hold that it is the application of mandatory life without parole to those 18-year-olds—some of whom will inevitably share the same mitigating characteristics of youth as juveniles—that offends our Constitution, not the application of this sentencing scheme to Parks specifically."); *Taylor*, 510 Mich at 135 ("A steady line of precedent from the Supreme Court could not be clearer—persons under 18, *as a group*, are less culpable than adults, more prone to outside influence, and more likely to be rehabilitated."). "This is why the Supreme Court has, for example, *categorically* banned certain punishments for defendants under 18 and why *all* juvenile offenders are entitled to a discretionary sentencing procedure when it comes to LWOP sentencing." *Taylor*, 510 Mich at 135. In other words, the prosecutor cannot avoid *Miller* or its progeny, including *Stovall*, by arguing that defendant, in particular, is guilty of heinous offenses warranting a harsh sentence. Indeed, to argue that defendant stands out among juveniles as deserving a parolable life sentence illustrates the problem identified in *Stovall* insofar as defendant is being subjected to this sentence without the procedural safeguards afforded to first-degree murderers under *Miller* and *Taylor*. In short, the prosecutor's attempt to justify the sentence on appeal lacks merit. Instead, in keeping with *Stovall*, 510 Mich at 322, we conclude that defendant's parolable life sentence is unconstitutional, and we remand for further proceedings under *Stovall*.

We affirm defendant's convictions but remand for resentencing on defendant's solicitation convictions under *Stovall*. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Kathleen Jansen
/s/ Noah P. Hood